ANN M. CLAPP, Respondent, *v.* ELIZA FULLERTON, Appellant.

Where non-professional witnesses, who did not attest the execution of a will, are examined as to matters within their own observation, bearing upon the competency of the testator, they may characterize as, in their opinion, rational or irrational, the acts and declarations to which they testify; but the examination must be limited to their conclusions from the specific facts they disclose, and they cannot be permitted to express their opinions on the general question, whether the mind of the testator was sound or unsound.

An exception to this rule is admitted in the case of attesting witnesses; whose testimony relates to the condition of the testator at the very time of executing the will, and who may well retain a recollection of the general result of their observation, after the particular circumstances have been effaced by lapse of time.

On appeals from the decrees of surrogates, the review is in the nature of a rehearing in equity; and the admission of improper evidence on the original hearing will not justify a reversal of the final decision, if the facts established by legal and competent evidence are plainly sufficient to uphold it.

It is not sufficient to justify the rejection of a will, that a testator, in other respects competent, entertained the mistaken idea that one of his daughters was illegitimate, if it was not the effect of insane delusion, but of slight and inadequate evidence acting upon a jealous and suspicious mind.

Where the conduct of the proponent has been such as to indicate probable cause for contesting a will, the costs of both parties may be charged upon the estate.

APPEAL from a judgment of the Supreme Court in the fourth district, affirming a decision of the surrogate of the county of Washington, admitting to probate the last will of Oliver Selfridge, deceased.

The testator died in his seventy-seventh year, at Argyle, in the county of Washington. He left a small property, amounting to some $1,800 or $2,000. The contest is between his daughters, Mrs. Fullerton and Mrs. Clapp, who are his only children and sole legatees.

He made the will, in question, on the 10th of December, 1861, giving all his property to Mrs. Clapp except a legacy of $100 to Mrs. Fullerton. In a previous will, executed in May, 1860, he bequeathed $1,000 to his daughter Mrs. Fullerton, directing the residue to be equally divided between her and her sister Mrs. Clapp, and explaining the inequality

of the bequests by the statement, that he considered he had given as much as $1,000 to Mrs. Clapp, in the sale of his homestead to her husband; and this statement is confirmed by the proof, which shows the sale to have been for about two-thirds the value of the property.

The will was contested by Mrs. Fullerton on various grounds; but those principally relied on were the imbecility or lunacy of the testator, and undue influence on the part of Mrs. Clapp the proponent.

On the part of the contestant, evidence was given tending to show that at the date of the will the testator was enfeebled by age, disease and infirmity; that his mental faculties were impaired; that he was loquacious and querulous; that he was forgetful of facts and events, which even an old man would be likely to remember; that he was conscious of these infirmities, and complained of them; and that the proponent, with whom he lived, had characterized him as childish, not only in conversation, but also in a letter to her sister, written the spring before the execution of the will.

To this was superadded proof by witnesses who were not claimed to be experts, but who stated the facts on which their opinions were based, that, in their judgment, he was incapable of transacting business during the last year of his life.

This proof was met by evidence of a similar character from witnesses on the part of the proponent, who, in some instances, without stating the facts on which their judgment was based, testified that his mind, in their opinion, was sound. Exceptions were taken on both sides to the admission of this description of evidence.

Proof was also given by the proponent, tending to show the entire competency of the testator, by his acts and conversation, his intelligence in the transaction of business, and his declarations in respect to his will, and to the motives which led him to change his previous testamentary provisions.

Evidence was adduced by the contestant, tending to show that during the last year of his life, the testator was laboring

under the insane delusion that his first wife, who had been dead some forty-five years, had been guilty of infidelity, and that Mrs. Fullerton, the elder of their two daughters, was illegitimate, though born in wedlock a year after his marriage.

It appears that he communicated his impression on this subject, with the grounds on which it rested, to his brother Oliver Selfridge, to his sister Mrs. Wilson, and to his niece Mrs. McDugall. These communications seem to have been in each case privately made, and they were all subsequent to the execution of the first will. The principal fact on which his suspicion was based, was a declaration by his wife in her last illness, made in a condition of delirium produced by disease of the brain, and recalled after a long interval of years, when his physical and mental faculties were enfeebled by sickness and age.

It is manifest, from the evidence, that his suspicion was of recent origin, and that it rested on no substantial foundation. His wife bore an excellent character, and he retained for her an enduring affection down to the time of his second marriage, which was twenty years after her death. Her delirious expression had produced no doubt of her purity at the time it was made. The contestant had been his favorite daughter, and in the will made two years before his death, he had given her about two-thirds of his property.

It was proved by the declaration of the testator, that the question as to the legitimacy of Mrs. Fullerton, had been the subject of conversation between him and the proponent and her husband. It was also proved by the admission of the proponent, that this suspicion had its origin in the mind of her father nearly two years before his death, and in the interim which intervened between the execution of the first and the second will.

It was discredited, in the strongest terms, when he communicated it to his brother, his sister and his niece; but it does not appear, from the evidence, to have been discouraged on any occasion by the proponent or her husband. Rumors, tending to give it a color of credit, were set afloat after the

testator's death, and though not directly traceable to any particular source, they derive significance from the subsequent intimation by the proponent to Mrs. Wilson, that her mother had been too intimate with her father's brother.

The facts mainly relied on as evidence of undue influence were these : 1. The existence of this unfounded suspicion or delusion, and the subsequent gift of the bulk of his property to the daughter with whom he resided, and who was alone interested in giving countenance to the imputation. 2. His previous known and acknowledged preference for the contestant, as between her and his younger daughter. 3. His rooted prejudice against Clapp, the husband of the proponent, and his frequent complaints, running through a series of years, and down to the time of his death, that he had been the victim of imposition on the part of his son-in-law, who had dealt with him in a spirit of meanness, duplicity and deceit. 4. His constant discontent with his residence in the family of his daughter, during the last year of his life, and his repeated attempts to induce the contestant and others to furnish him with a home more congenial. 5. His repeated complaints that letters passing between him and Mrs. Fullerton were intercepted, and that he was treated in the family with disrespect, inattention and neglect. 6. His loss of certain notes which he held against Clapp, and his evident suspicion that they were in the possession of the maker.

The evidence principally relied on to repel the imputation of undue influence, was that of one Durkin, an Irish employé of Clapp, who testified, in substance, that the testator had made him his confidant in respect to the will, and that he gave the bulk of his property to Mrs. Clapp "to keep her out of the poor house," under the belief that Mrs. Fullerton was in less needy circumstances.

The father of Clapp testified to a different version of the matter, given to him by the testator, subsequent to the execution of the will. It was, in effect, that "he had done some little more for Mrs. Fullerton than Ann Maria—some little present." He intimated that "there had been wrongs committed, and he was glad he had been spared to rectify some

of these wrongs." He added, that Mrs. Clapp "had been very kind, and that he had or would make her restitution."

Theodore W. Clapp, the proponent's son, testified to a more summary version of the matter, as given to him by the testator. It was, in substance, that he had heard "there was to be a turning over of matters and things in general, and his will when he died;" that "he had made a will once to please some others, and now he had made a will to suit himself;" that "his wife said on her death bed that Eliza was not his daughter, but that she was then insane and out of her head, and he always claimed her as his daughter and always would; that he did not know anything to the contrary himself."

Some evidence was given reflecting unfavorably on the characters of Durkin and T. W. Clapp, and witnesses were called to sustain them. The impeachment was too indecisive to affect their general credit.

The will was admitted to probate, and the decision was affirmed on appeal.

*James S. Coon*, for the appellant.

*E. Hill* and *A. D. Wait*, for the respondent.

PORTER, J. The surrogate seems to have assumed that non-professional witnesses, who did not attest the execution of the will, were competent to express an opinion on the general question of testamentary capacity. When a layman is examined as to facts, within his own knowledge and observation, tending to show the soundness or unsoundness of the testator's mind, he may characterize, as rational or irrational, the acts and declarations to which he testifies. It is legitimate to give them such additional weight as may be derived from the conviction they produced at the time. The party calling him may require it, to fortify the force of the facts, and the adverse party may demand it as a mode of probing the truth and good faith of the narration. But to render his opinion admissible, even to this extent, it must be limited to his conclusions from the specific facts he discloses. His position is that of an observer and not of a professional expert.

He may testify to the impression produced by what he witnessed; but he is not legally competent to express an opinion on the general question, whether the mind of the testator was sound or unsound.

An exception to this rule is recognized in the case of attesting witnesses. They are present at the very act of execution, and their opinions on the general question of testamentary capacity are admitted *ex necessitate*. It is the policy of the law to provide all possible safeguards, for the protection of the heir as well as the testator. No light is excluded in reference to the *res gesta*, which can be furnished by the immediate actors. The subscribing witnesses may be required to state, not only such facts as they remember, but their own convictions as to the testator's capacity; for it may well happen, that on so vital a point they may retain a clear recollection of the general result, long after the particular circumstances are effaced by lapse of time or obscured by failing memory.

In the present case, the attesting witnesses were not called upon to express their judgment; but others, not qualified to speak as experts, were permitted to testify generally that, in their opinion, the testator was of sound mind. That this ruling was wrong, is shown, with great clearness and force, in the opinion delivered by Judge BOCKES, at the General Term. If the error had occurred on the trial of an ordinary action at law, it would have called for a reversal of the judgment, in accordance with the rule on this subject, as heretofore limited and defined by the successive decisions in the case of *De Witt* v. *Barley*. (5 Seld., 371; 17 N. Y., 340, 347.)

The court below was right, however, in holding that the error was not fatal, if it be apparent, upon the whole case, irrespective of the evidence improperly admitted, that the testator was clearly competent, and that the will was properly admitted to probate. On appeals from the decrees of surrogates, the Supreme Court succeeds to the jurisdiction and authority of the old Court of Chancery. The review is in the nature of a rehearing in equity; and the admission of improper evidence, on the original hearing, furnishes no

ground for reversing the final decision, if the facts established by legal and competent testimony are plainly sufficient to uphold it. (*Schenck* v. *Dart*, 22 N. Y., 420, 421.)

In this case the proof is clear, that the statutory forms were observed in the execution of the will, and that the testator had sufficient intelligence to understand the nature and effect of its provisions. The vigor of his mental faculties was impaired, but not to such an extent as to disable him from making a testamentary disposition of his property. He retained a clear recollection of the provisions of his previous will; and his determination to change them was thoughtful and deliberate, whether the motives that induced it were rational or irrational. The case bears no analogy to that of a testator, who contributes nothing to his will but a series of nods and a cross, or a signature traced by a guiding hand stronger and steadier than his own.

Before he directed the preparation of the instrument, he had avowed his intention to make Mrs. Clapp his principal legatee. He assigned as a reason for the alteration, the change which had recently occurred in the relative pecuniary circumstances of his elder and younger daughter. He went a considerable distance, on foot and alone, to procure the previous will, which he had deposited at the house of a friend. He intrusted an intelligent professional gentleman with the preparation of a new will, and personally gave him the instructions from which it was drawn. It was subsequently executed in the presence of the draftsman and the subscribing witnesses, and in the absence of the principal beneficiary. He wrote his own signature, requested the witnesses to attest it, and declared the instrument to be his last will. He subsequently communicated to others the fact of its execution, and the motives which induced him to give the bulk of his property to the proponent. In view of these undisputed facts, the opinions of non-professional witnesses on the general question of testamentary capacity, could have no possible weight; and all such testimony should be disregarded as needless to the proponent and harmless to the contestant.

It was also insisted that, aside from the issue of imbecility, the testator was disqualified by lunacy. This claim rested on the assumption, that during the last year of his life he was laboring under an insane delusion as to the legitimacy of his elder daughter. To sustain the allegation, it is not sufficient to show that his suspicion in this respect was not well founded. It is quite apparent, from the evidence, that his distrust of the fidelity of his wife was really groundless and unjust; but it does not follow that his doubts evince a condition of lunacy. The right of a testator to dispose of his estate, depends neither on the justice of his prejudices nor the soundness of his reasoning. He may do what he will with his own; and if there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust.

In determining the question whether his impression, in regard to his wife, was due to insane delusion, attention must be given to the circumstances in which it originated, and to his physical and mental condition at the time it obtained lodgment in his mind. She died at the age of twenty-six, when he was thirty years old. He married again after an interval of twenty years. He had no children by the second wife, and was grievously disappointed at her death by a bequest of a portion of her property to her relatives. Some three years before her decease he sold his house to Clapp, and from that time until his death, he was a boarder in the proponent's family. He was uneasy and discontented, seeking some opportunity to find a more agreeable home, charging his daughter with irreverence and neglect, and her husband with cupidity and fraud. He was overtaken by disease, and became irritable and infirm. He was strongly attached to his elder daughter in Ohio, and in his first will, made some two years before his death, he gave to her the greater portion of his property. After the execution of this will his infirmities increased. He became nervous and querulous, and was easily moved to tears. He was conscious of the decay of his faculties, and apprehensive of the approach of

death. His memory became unretentive of recent occurrences, and, as usually happens in such cases, his mind was constantly recurring to the incidents of early life. It is one of the compensations of age, that when current events cease to imprint themselves upon the memory, those of former years are often reproduced with the freshness of first impression, and become the leading topics of reflection and conversation.

The testator, in view of his own approaching end, very naturally recurred to the circumstances attending the death of his first wife, which had been the most marked event in his own family history. He unfortunately recalled a declaration made by her on her death-bed, that the contestant, though born in. wedlock, was not his daughter. He knew that it was uttered in the delirium of a fatal disease of the brain, but he permitted it to be a source of uneasiness and disquietude, until it made an impression on his mind, in his then feeble and morbid condition, which it had not produced when the incident occurred. He connected it with the circumstances of his occasional absence from home during the first year of his married life, of her light-hearted youth and gayety, and of suspicions which had fallen upon some who had been early associates of the family; and he was thus led to apprehend that her statement, though made when she was delirious, was more significant than he had deemed it at the time. He admitted that he had attached no importance to the declaration when it was made, and expressed his surprise that it had not impressed him more deeply. He spoke of it, however, only to his nearest relatives, and evidently appreciated the embarrassment and delicacy of alluding to it at all. He continued to refer to Mrs. Fullerton in terms of kindness and affection, acknowledged that he did not and could not know that she was not legitimate, and declared that he should always continue to claim and treat her as his daughter. It is manifest that his original judgment was right. He dismissed the delirious expression of his wife as of no moment, when all the circumstances were fresh, and

his mind healthy and vigorous; but when his affection for her had waned with the lapse of time, and he was no longer able to recall the grounds of his former confidence in her fidelity, the recollection of the incident produced undue impression on a mind enfeebled by age and disease. The fact should be referred to weakness and credulity rather than to insane delusion. The repose of families has often been disturbed on grounds as slight and trivial as those which misled the testator. It is evident that he did not arrive at a clear and settled conviction that he had been wronged in the conjugal relation; but he was brought to a condition of doubt, suspense and uncertainty, which not only saddened the last year of his life, but entailed unmerited reproach on the names of his wife and eldest daughter, and doubtless coöperated with other causes in changing the direction of the inheritance.

The allegation of undue influence rests, mainly, on inferences to be deduced from facts, which are proved only by the declarations of the testator. These are too vague and indeterminate in their nature to lead to a clear and satisfactory conclusion. The mind is involuntarily predisposed against the will by its apparent inequality and injustice. Many of the circumstances surrounding the transaction cloud it with grave suspicion. The strong probability is, that the testator's false impression in regard to his wife received encouragement from those who should have been the first to disabuse him of his error. It appears, from the testimony of his sister, Mrs. Wilson, that even after his death the proponent affected to credit the scandalous imputation; though it would seem, from the nature of the case, that the only absolute assurance she could have, either of her own or her sister's legitimacy, was the purity of the mother whose honor she seemed ready to impugn. We do not think the proof of undue influence rises to a degree of strength which would justify the rejection of the will. There was probable cause for contesting the validity of the instrument; and, while we think the judgment should be affirmed, it should be

with directions that the costs of both parties be paid from the estate.

MORGAN, J., read an opinion for reversal; WRIGHT, SMITH, PECKHAM and LEONARD, JJ., concurred in the opinion of PORTER, J.; DAVIES, Ch. J., concurred in the opinion of MORGAN, J.

Judgment affirmed, with directions that the costs of both parties be paid from the estate.