SAMUEL R. BRICK et al., Appellants, *v.* JULIA E. BRICK et al., Respondents.

A person having capacity sufficient to acquire a large fortune by personal industry and intelligence, who successfully conducts a large business, whose business correspondence shows a clear comprehension of the subjects upon which he writes, and who is pronounced by his intimate friends of sound mind, and of more than ordinary intelligence and firmness, will not be considered as incompetent to make a will simply because he exhibits eccentricities of character in regard to himself, is subject to fits of melancholy in regard to his health, even amounting to hypochondria.

To avoid a will on the ground of undue influence, it must be made to appear that it was obtained by means of influence amounting to moral coercion, destroying free agency, or by importunity, which could not be resisted, so that the testator was constrained to do that which was against his actual will, but which he was unable to refuse or too weak to resist.

The exercise of undue influence need not be shown by direct proof; it may be inferred from circumstances, but the circumstances must be such as to lead justly to the inference that undue influence was employed, and that the will did not express the real wishes of the testator.

The admission of improper evidence in proceedings before a surrogate for the probate of a will is not ground for reversal of his decision admitting the will to probate, if it appears from the whole case that the will was properly sustained.

Where, in the matter of a probate of a will, the surrogate has acquired jurisdiction of all the parties in interest, he is not divested of this juris-

diction by the death of one of the parties, and where the survivors appear and litigate, without objection because of an omission to bring in the heirs and representatives of the deceased party, such omission cannot impair the validity of the proceedings as to the survivors.

(Argued December 17, 1875; decided May 23, 1876.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department affirming a decision of the surrogate of the county of Kings admitting to probate the will of Joseph K. Brick, late of Brooklyn, deceased.

The deceased died August 7, 1867, aged fifty-five years, leaving Julia E. Brick, his widow, three brothers and a sister him surviving. He left a large estate, all of which by the will was given to his widow. The will was contested upon the ground of mental incapacity and of restraint and undue influence. The citation was served upon all the heirs and next of kin. Pending the hearing before the surrogate John E. Brick, one of the brothers of the deceased, died, leaving four children. No proceedings were had to bring them in, and no objection was taken on that account. They appeared in the Supreme Court upon appeal. The facts disclosed upon the hearing are set forth sufficiently in the opinion.

*D. R. Jaques, M. B. Field* and *Henry E. Davies* for the appellants. The fact that a will is unjust is of itself evidence tending to show that it was obtained by fraud or undue influence. (*Fisher* v. *Clarke*, 1 Paige, 176; *Lynch* v. *Clements*, 24 N. J. Eq., 431; Redf. on Wills, 520, 527, 528; *Harvey* v. *Sullens*, 46 Mo., 147, 154; *Davis* v. *Calvert*, 5 G. & J., 300; *Turner* v. *Cheesman*, 2 McC., 265; 1 Jar. on Wills, 36, 39; *Gilbert* v. *Gilbert*, 22 Ala., 529; *Darley* v. *Darley*, 3 Bradf., 481; *Tyler* v. *Gardner*, 35 N. Y., 596; *Marvin* v. *Marvin*. 5 T. & C., 429; 3 Hun, 139; *Gardner* v. *Gardner*, 34 N. Y., 155; *Seguin* v. *Seguin*, 3 Keyes, 663.) Undue influence in regard to a will may be established by showing influence possessed and exerted by the chief beneficiary over the decedent in respect to other subjects. (*Lewis* v. *Mason*, 109 Mass.,

169 ; Redf. on Wills, 519, 523 ; *Mountain* v. *Bennett*, 1 Cox, 355 ; *Jackson* v. *Jackson*, 32 Ga., 325.) It need not be proved directly, but may be established by circumstances. (*Marvin* v. *Marvin*, 3 Abb. Ct. App. Dec., 192 ; *Reynolds* v. *Root*, 62 Barb., 254 ; *Davis* v. *Calvert*, 5 G. & J., 269, 303 ; *Hall* v. *Hall*, 1 E. L. & Eq. [P. & D.], 482 ; *Taylor* v. *Williams*, 20 Mo., 306.) It was proper to consider, in determining the question of undue influence, the provisions of the will, the mental and bodily condition of the decedent, his relation to the beneficiary claiming under it, and to those who would naturally be the objects of his bounty, and their conduct, acts and declarations. (Swinb. on Wills, 447 ; Lovelass on Wills, 139 ; Redf. on Wills, 515 ; *Fulke* v. *Adam*, 1 Redf., 454 ; *Fairchild* v. *Buscomb*, 35 Vt., 398 ; *Bunbien* v. *Cicott*, 12 Mich., 459 ; *Pelamoresnes* v. *Clark*, 9 Iowa, 1 ; *Lucas* v. *Penmas*, 27 Ga., 593 ; *Lamb* v. *Gritman*, 26 id., 625 ; *Stedman* v. *Stedman*, 32 Ala., 525 ; *Dean* v. *Negley*, 41 Penn., 312 ; *Mountain* v. *Bennett*, 1 Cox, 353 ; *Harwood* v. *Baker*, 3 Moore's P. C., 282 ; *S. F. Soc.* v. *Hopper*, 33 N. Y., 619 ; *Smith* v. *Tibbett*, 1 L. R., 398 ; *Welsh Will*, 7 N. Y. Leg. Obs., 153 ; *Waring* v. *Waring*, 6 Moore's P. C., 309 ; *Lee* v. *Dill*, 11 Abb. Pr., 214 ; *Delafield* v. *Parish*, 25 N. Y., 9 ; *Clarke* v. *Fisher*, 1 Paige, 171 ; *Allen* v. *Pub. Admr.*, 1 Bradf., 378 ; *Dew* v. *Clark*, 3 Ad., 79 ; *Landis* v. *Landis*, 1 Grant's Cas. [Penn.], 248 ; *Reynolds* v. *Root*, 62 Barb., 250 ; *Kinne* v. *Johnson*, 60 id., 69 ; *Voorhies* v. *Voorhies*, 39 N. Y., 463 ; *Barry* v. *Boyle*, 1 T. & C., 422 ; *Coffin* v. *Coffin*, 23 N Y., 9 ; *Forman* v. *Smith*, 7 Lans., 449 ; *Tyler* v. *Gardner*, 35 N. Y., 559 ; *Campbell* v. *Dubois*, 4 Barb., 393 ; *Van Pelt* v. *Van Pelt*, 30 id., 134 ; *Leech* v. *Leech*, 4 Am L. J., 179.)

*Samuel Hand* and *W. M. Graham* for the respondents. Mere weakness of mind does not incapacitate a testator, nor do perverse opinions or unreasonable prejudices. (*In re Forman's Will*, 54 Barb., 274 ; *Jackson* v. *Jackson*, 39 N. Y., 153 ; *Clapp* v. *Fullerton*, 34 id., 190 ; *Seaman's Soc.* v. *Hop*

*per*, 33 id., 619; *Delafield* v. *Parish*, 25 id., 97; *Stewart* v. *Lispenard*, 26 Wend., 255; *Blanchard* v. *Nestle*, 3 Den., 37; *Burger* v. *Hill*, 1 Bradf., 360; *Seguine* v. *Seguine* 4 Abb. Ct. App. Dec., 191; *McGuire's Estate*, 1 Tuck., 196; *Gardiner* v. *Gardiner*, 34 N. Y., 155; *Boughton* v. *Knight*, L. R., 3 P. & D., 64; *Sefton* v. *Hapwood*, 1 F. & F., 598; *Grindall* v. *Grindall*, 4 Hagg. Eccl., 1; *Winch* v. *Murray*, 3 Curt. Eccl., 623; *Peck* v. *Cary*, 27 N. Y., 18; *Ross* v. *Christman*, 1 Ired., 209; 1 Redf. on Wills, 52.) Monomania will not affect the will when it is upon subjects entirely unconnected with its provisions. (*Stanton* v. *Weatherwax*, 16 Barb., 259; *Martin* v. *Johnston*, 1 F. & F., 122.) Undue influence, to vitiate a will, must be an influence exercised by coercion, imposition or fraud; it must be such as to deprive the testator of the free exercise of his will. (*Gardiner* v. *Gardiner*, 34 N. Y., 155; *Parfitt* v. *Lawless*, L. R. [2 P. & D.], 462; *Boyse* v. *Ld. Rossborough*, 6 H. L. Cas., 2; *Lovett* v. *Lovett*, 1 F. & F., 581; *Newhouse* v. *Goodwin*, 17 Barb., 236; *Carroll* v. *Norton*, 3 Bradf., 291; *Blanchard* v. *Nestle*, 3 Den., 37; *Dean* v. *Negley*, 41 Penn., 312; *Small* v. *Small*, 4 Greenl., 220; *Jackson* v. *Jackson*, 39 N. Y.. 153; *Marvin* v. *Marvin*, 4 Keyes, 9; *Handley* v. *Stacey*, 1 F. & F., 574.)

RAPALLO, J.  The probate of the will in question is contested on the ground of want of testamentary capacity in the testator, and also of undue influence exercised over him by his wife, Mrs. Julia E. Brick.

The will was executed in March 1860.  The testator died in 1867, aged about fifty-five years.  At the time of the execution of the will and subsequently the testator was in active business.  He was engaged in the management of the affairs of the Brooklyn Gas Company, and also in setting up gas retorts at Newport R. I.  His voluminous business correspondence during the month of March 1860, and the preceding and subsequent months, exhibits a vigorous intellect, and apparently a very clear comprehension of the subjects upon which he

writes, while the minute instructions which his letters contain show close attention, energy and continuity of purpose. That correspondence, if there were no other evidence in the case, is sufficient to show a degree of mental capacity, far exceeding that which is required to render a person competent to make a will. But, in addition, the proponents called a large number of disinterested witnesses, who were well acquainted with the testator, and many of them in intimate business and social relations with him, who pronounce him a man of sound mind, and more than ordinary intelligence and firmness. Several of the contestants' witnesses concur in this judgment. Even the son of the principal contestant, candidly concedes that he always thought the testator of sound mind, and never saw any thing to the contrary, and thought him a man of firmness and decision of character, and good judgment in business matters, and the physician who attended the testator during his last illness, and who was examined by the contestants, testifies that even at that time, the testator's mind was sound and well balanced, and his judgment and memory good.

The evidence on the part of the contestants tends to show eccentricities of character, especially in regard to medicating himself for real or supposed diseases, and much testimony is devoted to showing that he was in the habit from an early period in his life of taking large quantities of medicine, and was subject to fits of melancholy on the subject of his health, amounting, as claimed, to hypochondria. I cannot but believe that the facts in this respect are greatly exaggerated by the witnesses, but taking their testimony as true, they do not, in connection with the uncontroverted facts in the case, show that want of mental capacity which should avoid a will. These peculiarities existed as claimed by contestants from the testator's boyhood, and it would be indeed strange that a person should have the capacity to acquire a large fortune by his personal industry and intelligence, and from causes existing at the same time be held not to have sufficient mental capacity to dispose of it by will.

Many of the occurrences testified to by the contestants' witnesses, and from which they seek to infer a disordered mind, took place long after the making of the will in question, but taking them all into consideration, they fail to overthrow the clear evidence with which the case abounds, of the competency of the testator to transact business. A morbid condition of mind on the subject of his health — great depression, resulting from the loss of his children, and some peculiarities or eccentricities in his domestic life, are disclosed by the testimony on the part of the contestants. But his competency to make a will is, we think, established beyond question.

It is claimed, however, upon the part of the contestants, that Mrs. Julia E. Brick, availing herself of the enfeebled condition of the decedent, by undue influence, procured the execution of the will, in question, in her favor. To avoid a will on this ground, it must be made to appear that it was obtained by means of influence amounting to moral coercion, destroying free agency, or by importunity which could not be resisted, so that the testator was constrained to do that which was against his actual will, but which he was unable to refuse, or too weak to resist. (1 Jarman on Wills, 36, 39; Redfield on Wills, 529, 530; *Gardiner* v. *Gardiner*, 34 N. Y., 155, 162; *Seguine* v. *Seguine*, 3 Keyes, 663.)

No importunity or direct action, on the part of Mrs. Brick, to induce the making of this will is shown. It is not indispensable that there should be direct proof of the exercise of undue influence. It may be inferred from circumstances; but the circumstances must be such as to lead justly to the inference that undue influence was employed, and that the will did not express the real wishes of the testator. The circumstances immediately attending the execution of this will, so far from indicating that it was the result of any influence exerted upon the testator, tend strongly to show that it was his free and spontaneous act. It was made on the 16th of March, 1860, without the knowledge of Mrs. Brick, who testifies that she did not even know of its existence until after the death of the testator, and was not even acquainted with

the counsel who drew it. It further appears that it was a transcript of a will which the testator had made in 1855, excepting only a change in the name of the executor. This will of 1855 the testator took to the office of his counsel, Ingraham, Underhill & Reynolds, Esqs., and requested Mr. Ingraham to alter it, by substituting Mr. Howe as executor, and it was re-engrossed with that alteration and executed. Mrs. Brick had no part in the transaction, and was ignorant of it. This will of 1855, which made the same disposition of the testator's property, appears equally to have been the free act of the testator. He called at the office of C. P. Smith, Esq., his counsel, and requested him to draw his will, and, after consultation with Mr. Smith, directed him to draw the will, leaving all his property to his wife. He then had an infant child living. No agency or participation of Mrs. Brick in the making of this will appears, and she testifies that she did not know of it until after it was made, and never read it. The codicil of 1866 makes no change in the will of 1860, except that of adding Mr. White as executor, and the circumstances under which it was executed tend very strongly to show that the will of 1860 expressed the true wishes of the testator, and was not the result of any influence or constraint. The testator went alone to the office of the Messrs. Ingraham and stated that all the alteration he desired was the adding of Mr. White, who had become his partner, as executor, and that if it could be done by a codicil the will was just as he wished it. Mr. William M. Ingraham, one of the witnesses to the codicil, on his cross-examination by the contestants, testified that the testator gave as a reason why he would rather have a codicil than execute a new will, that he had brothers and a sister to whom he wished to leave nothing; that he wished to leave all his property to his wife; that it had come to his ears that his competency to make a will would be disputed, but he did not believe any question could be raised about his competency to make a will at the date of that will, and therefore he preferred not to have it altered, and whatever change he made he would make by a codicil and reaffirm that will. The codicil was

drawn accordingly and executed by the testator at the office of the Messrs. Ingraham. It thus appears that from 1855 to 1860 the testator entertained the intention of leaving all his property to his wife. That the death of his children produced no change in this intention, and that it continued down to the year 1866, when the codicil was executed. As before observed, there is no direct evidence of any attempt on the part of Mrs. Brick to influence the testator in respect to his testamentary dispositions, but the contestants seek to establish that she possessed a powerful influence over him, which she employed in unjustly prejudicing his mind against his brothers and sister, and estranging and secluding him from them, and that by these means she diverted to herself the bounty which he would otherwise have bestowed upon them.

A vast amount of testimony was taken upon this point, going into all the details of the history of the family, and the minutest particulars of the domestic life of the testator, and of his intercourse and dealings with his brothers and sister. And from a consideration of all this testimony, the duty devolves upon us of determining whether the court below correctly decided the question of fact.

This involves not only the consideration of the weight to be attached to the circumstances testified to by the witnesses, but also the credibility of their statements, the great bulk of the testimony relied upon by the contestants proceeding from the parties interested in breaking the will. A detailed review of the evidence would be out of place here, and we must content ourselves with some general observations concerning it.

In the first place, it cannot escape our attention that a very large proportion of the testimony has a very remote, if any, bearing upon the question at issue, as it relates to a period long subsequent to the making of the will.

The relatives from whom it is alleged that Mrs. Brick sought to estrange the testator were his sister, Mrs. Winchester, and her children, his niece Mary E. Brick, and his brothers Edward K., John E., and Samuel R. Brick. Suspending for the present any observations concerning Mrs. Winchester, our attention

is first called to the evidence relating to the testator's niece
Mary E. Brick. Much stress is laid upon the alleged conduct
of Mrs. Julia E. Brick in relation to this niece, resulting, as is
testified to by some of the witnesses, in her preventing the
testator from indulging the sympathy which he expressed for
her, and even from paying for clothing which he had ordered
to be purchased for her. But all this occurred years after the
making of the will now offered for probate. The visit of
this niece to the testator, with which this branch of the case
commences, did not occur until 1864, and it is difficult to see
how any conduct of Mrs. Brick at that time could have
influenced the will made in 1860.

The same observation applies to his treatment of his brother
Edward K. Brick. It is alleged that Mrs. Julia E. Brick
exerted her influence over her husband to induce him to with-
draw his support from Edward, and to alienate his affections
from him, and finally to turn him off after having induced
him to break up his home in the west. But all this branch
of the case begins in the year 1864. No effort to create any
estrangement before that time is shown. The omission to
provide for Edward in the will of 1860 cannot be attributed
to what occurred four years afterwards. All the testimony
relating to the man Gildersleeve, his poisoning the testator's
mind against Edward, and Mrs. Brick's causing Gildersleeve
to be retained in the employ of the testator, and Edward to
be dismissed, occurred in 1864.

As to John E. Brick, the only evidence relating to a period
anterior to the making of the will, is, that when the testator
proposed, in 1854, to bring John from Vicksburg, Mrs. Brick
advised against it, and said he was better off where he was.
In 1857, however, the testator did cause John to come to him,
and offered him work, and it is said that Mrs. Brick stated
that John wanted to be foreman, and she did not think him
capable of being foreman, and that after being employed for
some time, he was superseded by a brother of Mrs. Brick.
All the other evidence in relation to John E. relates to occur-
rences in 1864, after John E. had been in the confederate army.

As to Samuel R. Brick, it is claimed that in early life he had materially aided the testator in establishing him in business, and otherwise, and that to him the testator owed the foundation of his fortune, but that Mrs. Julia E. Brick was determined that the testator should be alienated from him, and that she would prevent their meeting. These allegations are sought to be sustained by the testimony of the contestant, Edward K. Brick, his wife Catharine, and daughter Mary E., as to declarations of Mrs. Julia E. Brick, to the effect that she would prevent Samuel and the testator from meeting again. But all these declarations were made in 1864, and there is no proof of any attempt, prior to the date of the will, to interfere with the intercourse between the brothers.

Mrs. Catharine Brick testifies that the reason assigned by Mrs. Julia E. Brick for desiring that Samuel and the testator should not meet again was that they always quarreled when they met, and she had made up her mind that the testator should never see Samuel nor any one of the family if she could prevent it; that that would be the best course he could pursue; this was in 1864. It is also testified to by Samuel R. Brick that, on the occasion of the testator's illness in 1864, a request was communicated to him from Mrs. Julia E. Brick that he should not come to the house at that time, and that accordingly he did not go there again till the fall of 1865. All the evidence of the interference to prevent intercourse between the brothers relates to the year 1864, and proceeds from the contestants and their children, with the exception of the testimony of Jonathan P. Smith. This gentleman visited the testator at his house in Brooklyn, in, as he states, the last of May or June, 1860, which was after the will had been made. Samuel R. Brick had spent a night at the house at the same time. The following day at dinner, the testator and his wife being present, a conversation took place about Samuel coming to New York, and the witness says he thinks the testator said he thought Samuel was expecting to get something from his estate, and Mrs. Brick said he would be mistaken, that, if she could help it, he would not get any

thing; that she didn't want the money wasted in the extravagant way that Samuel lived, or words to that effect. The will had then been made, though Mrs. Brick was ignorant of it, as she testifies. The expression by Mrs. Brick of her opinions and wishes, in regard to the dispositions to be made by the testator, did not amount, of itself, to undue influence, so long as she did not use unfair or improper means to have her wishes carried out, and the testator was competent to form his own judgment and act in accordance with it.

Mrs. Winchester testifies, without locating the time, that Mrs. Brick told her that the testator should not leave Samuel's children, nor John, nor Edward, any thing if she could help it, and that she was not willing to have the testator do anything for her (the witness). This witness also testifies to many facts for the purpose of showing that Mrs. Brick estranged the affections of the testator from her and her children, and caused her to be expelled from his house in 1855. That a serious difficulty then arose between the testator and Mrs. Winchester is very certain. She attributes it to the influence of Mrs. Brick. Her allegations in this respect are controverted. Some light is thrown upon the state of feeling existing between Mrs. Winchester and her brother by the letter which she addressed to him on leaving, in which she threatens to sue him, and indulges in many intemperate expressions towards him. That ended their intercourse, and from the excited state of feeling disclosed by that witness her testimony should be taken with many grains of allowance. She is the only relative to whom the testator had, as far as appears, ever left any thing by any will. By a will made in 1852 he had bequeathed to her $8,000, but after this quarrel he made the will of 1855, omitting any provision for her.

Much testimony was introduced on the part of the contestants for the purpose of showing the degree of influence which Mrs. Brick exerted over the conduct and actions of the testator, but on the other hand the evidence is very strong to show that he was possessed of a firm and independent will, and we think that the preponderance of the testimony is to

the effect that at the time of the execution of the will in question he was in the full possession of his faculties, and that it was his free and voluntary act, uncontrolled by any improper influence of his wife, and was in accordance with the purpose which he had entertained for a long period of years. He had the right if he chose to exclude his brothers and sister from participation in his estate, and although a disregard of the claims of kindred is a circumstance to be considered in determining cases of this description, yet it is not controlling, nor is it necessary that the motives of the testator for so doing should be satisfactory to the court, provided we are satisfied that it was the real intention of the testator, and not the result of moral coercion, or deception practiced upon him. (*Clapp* v. *Fullerton*, 34 N. Y., 191; *Seguin* v. *Seguin*, 3 Keyes, 663, 669.) His repeated declarations, testified to by numerous disinterested witnesses, show a state of feeling towards his brothers which accounts for his not providing for them by his will without reference to any interference of his wife. His brother John he called a professional gambler. In 1857 the testator stated that he had given him $500 for his expenses in coming north and for the support of his family in his absence, but that John had, as he supposed, gambled it away on his passage, and that when he sent him back he gave him a gold watch, which he pawned, and bank stock, which he lost; that he was his own enemy, and one it was useless to try to help. With Edward he appears to have had little or no intercourse from 1846 to 1864, except sending occasional assistance to his family, and there seems to have been some delinquency on his part, for Edward in his letters to testator in 1864 promises to make amends for the past. As to Samuel, he was shown to be wealthy. The testator declared that he did not intend to leave him any thing; that he would leave it to a public institution first; that he did not need it, and lived extravagantly, and his children were extravagantly brought up; that he should have none of his money to buy diamonds with, etc., etc. The testator appears to have had very distinct notions of his own as to his relatives, and we are

not left to presume that his omission to provide for them was the result of the interference of any third party. There are many circumstances in the case on both sides, which we have not overlooked, though we have not deemed it essential to comment upon them, but on the whole evidence we are of opinion that the competency of the testator is sufficiently established, and that the contestants have failed to make out a case of undue influence or fraud which should vitiate the will.

A point is made in reference to a motion of the contestants to strike out the testimony of Mr. Ingraham as to conversations with the testator in 1867, on the ground that they were privileged communications. The surrogate reserved the decision of the motion until the close of the case. This course does not appear to have been objected to by the counsel for the contestants, and the motion does not appear to have been disposed of. No point, therefore, arises here. Even if the motion had been erroneously denied, that would not have been ground for reversal. In this class of cases the admission of improper evidence is not ground of reversal if it appear on the whole case that the will was properly admitted to probate. (*Clapp* v. *Fullerton*, 34 N. Y., 195 ; *Schenck* v. *Dart*, 22 id., 421.)

The same observation applies to the admission of Mrs. Brick's testimony, that she had no communication with the testator on the subject of making the will. Besides, this evidence was not introduced for the purpose of showing any admission of the testator, but bore upon the conduct of Mrs. Brick. The objection that the heirs of the contestant John E. Brick (who died pending the hearing in the Surrogate's Court) have not been brought in as parties, does not appear to have been taken either in the Surrogate's Court or in the Supreme Court, although the heirs of John E. Brick were parties to the proceeding in the Supreme Court. The surrogate only acquired jurisdiction of the subject-matter and of the persons of all the parties in interest at the commencement of the proceedings. He was not divested of this jurisdiction

by the death of one of the parties. The survivors went on before him without objection, and tried the case upon its merits, and the heirs of John E. Brick appeared in the Supreme Court on the appeal, but raised no point there as to not having been cited before the surrogate. Whether or not the representatives of John E. Brick were in fact represented before the surrogate does not appear. Whatever effect the death of John E. Brick, pending the hearing and the omission to bring in his heirs or representatives, may have upon their rights, and this it is not now necessary to determine, such omission cannot impair the validity of the proceedings as against the other parties who appeared and litigated without objection.

The judgment of the Supreme Court should be affirmed, with costs.*

All concur.

Judgment affirmed.

---

66  157
160  312

* The direction as to costs was subsequently modified so that the judg ment was without costs to either party as against the others in this court