## In re FRICKE'S WILL.

(*Supreme Court, General Term, First Department.* June 3, 1892.)

1. WILLS—UNDUE INFLUENCE—EVIDENCE.
    A will gave all the testator's property to his wife, and made her sole executrix. His heirs were his brother and sister, who were contestants. It appeared that the brother had been in the habit of vilifying the wife; that the relations between the testator and his wife were of the most cordial character; that she served him faithfully and well, and failed in none of her duties as wife; that she did nothing to induce the making of the will, which was drawn pursuant to his directions, and done with great deliberation. *Held*, that there was no undue influence on the part of the wife.

2. SAME—RIGHT TO DISPOSE OF PROPERTY.
    The fact that part of the property conveyed by the will was inherited from the father of the testator and the contestants did not prevent the testator's disposition of such property.

3. SAME—TESTAMENTARY CAPACITY—DELUSIONS.
    Even though the testator was laboring under a delusion that his brother was exercising his muscle preparatory to killing him, that of itself would not justify a rejection of his will on the ground that he was of unsound mind when he executed it.

4. SAME—DISEASE OF THE BRAIN.
    The testator executed the will eight months before his death, and the evidence showed his ability to transact his business up to a very short period before his death. On the autopsy it appeared that deceased had tumors on his brain, but they were not shown to have affected his mind, and it appeared that they could have existed without serious mental weakness. *Held*, that the evidence did not show. mental incapacity.

Appeal from surrogate's court, New York county.

Proceeding for the probate of the will of John Henry Fricke, deceased. A witness for contestants testified that the testator, on one occasion, said that the testator's brother, William, was exercising with dumbbells to raise muscle so that he would be able to kill the testator. From a decree of the surrogate admitting the will to probate, the contestants, William D. Fricke and Mary Elizabeth Jennings, appeal. Affirmed.

For former report, see 18 N. Y. Supp. 936, *mem.*

Argued before VAN BRUNT, P. J., and O'BRIEN and BARRETT, JJ.

*Horace Graves*, for appellants. *Crosby & Crosby*, (*W. P. Butler* and *C. P. Reid*, of counsel,) for respondent.

VAN BRUNT, P. J. The testator died on the 30th of October,.1888, leaving a last will and testament, which was executed on the 9th of February, 1888. He gave all his property, real and personal, to his wife, the proponent, and made her sole executrix. His heirs and next of kin were a brother, William, and a sister, Mary, who are claimed to be the contestants, it, however, being somewhat dubious as to whether the persons representing the sister, Mary, could have conferred upon them by her any authority to act. The probate of the will was objected to on the ground of want of due execution; that the will, if executed, was obtained by the undue influence of the testator's wife and sole legatee; and that the testator was not of sound mind at the time of the execution of the will. The will appears to have been executed with all the formalities required by the statute, before three witnesses, all of whom were examined upon the application for probate, and testified to the facts necessary to a valid execution of the will. It is true that, upon cross-examination, confused and contradictory statements were made as to some of the events attending the execution; but it is apparent, upon a reading of the testimony, that the formalities of the statute were complied with, and the will properly executed. In addition to that we have the testimony of the attorney who was present, and states what took place, and his testimony alone, if true,—and there is no reason to doubt it,—would be sufficient not only to justify but to require the probate. It is not necessary here to discuss this testimony at length.

The other objections, viz., that the will was obtained by undue influence, and that the testator was of unsound mind at the time of its execution, stand upon a slighter foundation than the claim which was advanced that there had been no due execution of the will. It seems to be assumed that the will was an unnatural one. We are of opinion, from an examination of the record, that if any other disposition had been made of the testator's property it might well have been said that he had not acted in a natural manner. It appears, from the evidence, that the contestant William had been in the habit of vilifying the testator's wife, which fact had come to the ears of the wife, and probably to those of the testator. This fact, it seems to us, would, of itself, have been a sufficient reason for refusing to allow William to participate in his estate. The conclusion derived from a reading of the evidence was that the relations between the testator and his wife were of the most cordial character; that she

served him faithfully and well, no matter what her antecedents may have been; that she failed in none of the duties which devolved upon her by occupying the position of wife to the testator; and that, instead of her ruling or controlling the testator, it is apparent, that his will controlled in his own household. We say apparent, because that fact appears from the testimony of the witness offered by the contestants. When pressed, they can show no instance in which his wife was able or attempted to overcome his will. It is a familiar principle that it is not sufficient to show that a party benefited by the will had the motive and opportunity to exert undue influence. There must be evidence that he did exert such influence, and so control the action of the testator, either by importunities which he could not resist, or by deception, fraud, or other improper means, that the instrument is not the will of the testator. *Cudney* v. *Cudney*, 68 N. Y. 148–152. There is not the slightest evidence of any importunity or direct action upon the part of the proponent to induce the making of the will. The evidence shows that the will was drawn pursuant to directions given by the testator; that it was not a sudden proceeding, but was done with great deliberation, and more than premeditation; and there is no evidence whatever that the proponent had any connection with or even urged the making of the will. In *Brick* v. *Brick*, 66 N. Y. 149, the court say: "No importunity or direct action on the part of Mrs. Brick to induce the making of this will is shown. It is not indispensable that there should be direct proof of the exercise of undue influence. It may be inferred from circumstances, but the circumstances must be just such as to lead to the inference that undue influence was employed, and that the will did not express the real wishes of the testator. The circumstances immediately attending the execution of the will, so far from indicating that it was the result of any influence exercised on the testator, tend strongly to show that it was his free and spontaneous act,"—language strikingly applicable to the facts of the present case. In *Re Smith*, 95 N. Y. 516–522, the court say: "Undue influence, which is a species of fraud, when relied upon to annul a transaction *inter partes*, or a testamentary disposition, must be proved, and cannot be presumed;" and in *Re Martin*, 98 N. Y. 193–196, it is said: "The case, then, is one where the testator had testamentary capacity, a present knowledge of the contents of the will, and where, at its execution, she was surrounded by all the guards which the statute prescribed to prevent fraud and imposition, a will under these circumstances can be avoided only by evidence amounting to force or coercion, and proof that it was obtained by this coercion. The burden of proving it is on the party who makes the allegation." The principles enunciated in the cases cited show that it requires more than proof of the opportunity to exert undue influence, and the fact of benefit arising from the will, to justify a finding of undue influence. There must be proof tending to show the fraud; and that proof must be inconsistent with the absence of undue influence or fraud. Suggestion, argument, solicitation, are not undue influence. It is only when the will of the testator has been overcome by active influence, so that he is no longer able to resist, no matter how much he may be so inclined, that undue influence is made out. It seems to us that the evidence establishes that the testator had a firm desire that his wife should have his property, and that was the reason for the execution of the will in February, and the deeds subsequently, in August.

It seems to be assumed upon the part of the contestants that, because a part of this property was inherited from their father, the testator, therefore, had no right to dispose of it as he might see fit. But we are not aware that any such consideration can enter into the question as to the right of a testator to dispose of his property. It makes no difference from what source it comes,—whether acquired by himself or inherited,—the law gives him the

right of disposition; and there are no such equitable claims in favor of collateral relatives against the wife as seem to be supposed upon the part of the contestants.

It is urged that the testator was laboring under delusions as to his brother, and that he was mentally incapable of performing a legal act. Even if we take as true the testimony which has been offered to establish this alleged delusion in respect to his brother, that of itself would not be sufficient to justify a rejection of the will. It was held in *Clapp* v. *Fullerton*, 34 N. Y. 190, that it is not sufficient to justify the rejection of a will that a testator, in other respects competent, entertains the mistaken idea that one of his daughters was illegitimate, if it was not the effect of an insane delusion, but of slight and inadequate evidence acting upon a jealous and suspicious mind. In that case the testator had made a marked distinction in the division of his property between his two daughters. It seems to us clear, from a reading of this testimony, that the contestant never supposed his brother to be of unsound mind and incapable of managing his affairs until after he was dead. He was allowed to remain in the possession of and to manage his property, which he did with reasonable skill and care. He did not exhibit in his business dealings, at least, any deficiency in mental acumen; and no idea of mental disease seems to have been suggested until, probably, after the autopsy which was made to discover the cause of death. The evidence is conclusive upon the fact of the testator's ability to transact his business up to a very short period before his death, and that he could do it intelligently, and required no assistance in respect thereto; and it is upon the autopsy that the whole basis of this claim of mental weakness stands. And when we come to examine the medical testimony, and that of the contestants' witnesses, it is manifest what slight grounds there are for the contention of testamentary incapacity. Great stress is laid upon the evidence of Dr. Dana. He was an expert, examined upon hypothetical questions, knowing nothing of the facts, and testified accordingly. In the hypothetical questions which were put to him upon the part of the contestants it is manifest that there were divers elements inserted in respect to which there was not the slightest evidence; one of which was that the stomach of the testator was healthy. There was no evidence that it had ever been examined. Upon the contrary, the evidence showed that, from the effects of the embalming fluid, its character had been so destroyed that nothing could be told respecting it; and that element would seem to have been an important factor in considering the effect of the tumors upon the brain, from which the testator was undoubtedly suffering. It required no expert to declare that the man described in the hypothetical question was incapable of legal action,—in other words, that he was insane, —because the very question itself described an insane man. If those facts were true, which they certainly were not, it was absolutely impossible that the testator could have carried on the business which beyond question he did carry on, or perform the acts which he did perform, without there being in the slightest degree any question as to his capacity. So, when the proponent came to put her hypothetical question to Dr. Dana, and asked him if such a man was insane, he answered, "No; because you describe a sane man with no elements of insanity present." Therefore, so far as this testimony was concerned, it did not appear whether these tumors had any effect upon his mind or not,—because they could exist without serious mental weakness, and might be the cause of mental weakness,—and consequently their existence could have little to do with the determination of the question of the testator's mental capacity. As has already been observed, it was only because of the existence of the tumors that the idea was suggested that this man had been insane for six or eight months prior to his death. It had not been dreamed of before. It requires proof considerably stronger than this to es-

tablish mental incapacity. The evidence seems to us to show much more than was necessary to uphold the testamentary act. As is said in *Horn* v. *Pullman*, 72 N. Y. 269–276, there is no presumption against a will because the testator may be a man of advanced age; nor can incapacity be inferred from an enfeebled condition of mind or body. Such a rule would be dangerous in the extreme; and the law wisely sustains testamentary dispositions made by persons of impaired mental and bodily power, provided the will is the free act of the testator, and he is able to comprehend the condition of his property, and the scope, meaning, and effect of the will. Applying this rule to the case at bar, it is apparent that there is not a *scintilla* of trustworthy evidence which impeaches the testamentary capacity of the deceased. There is not even present the element of an inequitable will, because, as has been observed, under the circumstances of the case, if he had acted otherwise it would appear that he had not done that which the principles of equity required him to do in respect to his property.

The points raised as to the rulings upon the admissibility of evidence do not seem to be at all well taken, except that relating to the testimony of Dr. Hevel, which, in our opinion, was not competent at the time it was admitted, but is competent under the law as it now stands,—an attending physician, where the executor waives the privilege, being allowed to testify. And as this is a court of original jurisdiction it may consider the evidence notwithstanding the exception. But even if Dr. Hevel's testimony was stricken out, there would be no reason whatever for coming to any different conclusion than that which has been arrived at. Upon the whole case, therefore, we are of opinion that the decision of the surrogate is right, and that the decree should be affirmed, with costs. All concur.