And as is said in West v. Ross, 53 Mo. 350:

"This case may be a hard case, and doubtless is; but the legislative enactment is clear; and, although it may deprive a portion of the citizens of the county of their right to be heard in the election of a clerk at one election, it is better that they should suffer this temporary privation than that the courts should habituate themselves to disregard or ignore the plain law of the land, in order to provide for hard cases."

And as was said by Judge O'Brien in the prevailing opinion of the court of appeals in People v. Board of Canvassers, supra:

"When we keep in mind the fact that the statute now under consideration was intended to prevent corruption and the consequent debasement of the franchise, it was not unreasonable to provide that if an elector attempts to exercise his right in such a way as to reveal the contents of his ballot, or make subsequent identification possible, the inspectors shall not receive it, and, if received, it shall not be counted. We would still be obliged to hold that it would be far better that their votes should be deemed ineffectual than that the fundamental purpose of an important public statute should be subverted, and, in the struggle to save those votes by judicial construction, the door should be thrown open for evasions of the statute, which might revive evils far more dangerous to the public welfare than can possibly, under any circumstances, follow the exclusion of  *  *  *  the votes cast by voters who  *  *  *  neglected to observe important requirements of the law."

While the court has approached the consideration of this case with the desire to give effect as far as possible to the probable intent of the electors casting these 41 ballots, and to disregard any errors which may properly be considered technical errors, yet the court has not the right nor the power to do violence to the plain intent and provisions of this important statute. The law in existence at the time of this election provided that, in voting the Independent ticket, it should not be lawful to make any mark upon the official ballot other than the cross (X) mark at the left of and opposite the name of the candidate voted for, and that any mark made on the ballot except as so provided should make the ballot void, and it could not be counted; and the court must give force to the plain language of the statute, and dismiss the complaint herein, with costs, as demanded in the answer.

(18 App. Div. 115.)

### LEDWITH v. CLAFFY.

(Supreme Court, Appellate Division, Second Department. May 18, 1897.)

1. WILLS—TESTAMENTARY CAPACITY.
    Testamentary capacity exists where testator is able to understand the nature, condition, and amount of his property, his relation to his kindred, and the nature and consequences of his will.
2. SAME—UNDUE INFLUENCE.
    A will is the result of undue influence where it was procured by importunities which testator was unable to resist.
3. SAME—EVIDENCE.
    Undue influence need not be proved by direct evidence, but may be inferred from circumstances.
4. EXPERT WITNESSES—TESTAMENTARY CAPACITY.
    A person is not qualified to testify as an expert as to the existence of insanity merely by an experience of three years as chaplain in an insane asylum.

Appeal from trial term, Rockland county.

Action by Vincent Ledwith, an infant, by his guardian ad litem, against Anne Claffy. From a judgment entered on a verdict in favor of plaintiff, and from an order denying a motion for a new trial, defendant appeals. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Arthur S. Tompkins, for appellant.
Thomas F. Magner, for respondent.

BRADLEY, J. The action was brought for the partition of real property of which James Ledwith, the grandfather of the plaintiff, died seised. The only heirs of James Ledwith, deceased, were the plaintiff and the defendant. The plaintiff charged that the alleged devise made by his grandfather of his real property was void. The contest had relation to the validity of an alleged will of James Ledwith, who died in July, 1894, at the age of 84 years. The date of the will was May 15, 1890, when he was living with his two daughters, the defendant and Julia, on his farm, in Bergen county, N. J. He, having become a widower, purchased this farm, lying partly in Rockland county, N. Y., and partly in Bergen county, N. J., and moved onto it about 20 years before his death, with his family, consisting of his three children,—those two daughters and his son, James. The son afterwards married, and the plaintiff is the issue of that marriage. James died in January, 1890. The daughter Julia died in July, 1892. By his alleged will, James Ledwith, Sr., gave all his estate, amounting to from thirty to forty thousand dollars, to his daughters or the survivor of them, except one thousand dollars, which was ultimately to go for the benefit of the family of the deceased son. The plaintiff's attack upon the will was founded upon the charge that the old gentleman was mentally incompetent to make a will at the time it was made, and that it was the result of undue influence practiced upon him. It is not questioned that, for some time preceding and up to the time of his death, he was substantially in the condition of imbecility as the consequence of senile dementia. How long he had been seriously thus afflicted was the subject of much conflicting evidence introduced by the respective parties at the trial. On the part of the plaintiff, many witnesses were called, and gave evidence tending to prove that in the year 1889 there was a marked change in his habits and conduct, indicating a want of mental control over his actions; and such evidence, if reliable, would render him incompetent not only to do any business, but to take care of himself; and there is some evidence to the effect that such change and condition appeared and existed two or three years prior to 1889, and thereafter continued; that, as the consequence of his condition, he would get lost when he was away from the house, would attempt to enter other people's houses, insisting that they were his place of residence; that he destroyed crops on his farm, conducted himself strangely at home, by throwing pork chops into the buttermilk on the table, throwing rotten apples into the churn while being used in

the process of making butter, attempting to put the hot tea kettle onto the mantel, and by doing some other things equally as strange and disorderly; that he was watched and taken care of and treated as a child, locked in his room at night, and his food selected and given to him in fixed allowances; that he did not converse intelligently; and that the defendant from time to time stated that he was crazy, that he was out of his mind, and words to like effect. Much of this evidence introduced by the plaintiff was not consistent with that furnished on the part of the defendant. The will was prepared by Mr. Kelly, a lawyer, whose evidence is to the effect that he, by request, for the purpose of drawing his will, called on Ledwith; inquired and was informed by him of his property, and the disposition he wished to make of it by will; that he called the second time for further instructions, and, when the will was finally prepared, he called the third time, and the will was executed; that Kelly, one of the subscribing witnesses, and the other, testified to the transaction of the execution of the will, in which all the requisite formalities were observed. The brother Thomas Ledwith was also present at the time of the execution of the will, and united with the others in testimony to the effect that the actions and conversation of the deceased were then intelligent and rational. The evidence given by many other witnesses called on the part of the defendant was to the effect that they had seen the decedent from time to time for some years before his death, and talked with him some, and that they observed no change affecting his mental condition until after the death of his daughter Julia, which occurred in July, 1892, more than two years after the will in question was made. Those witnesses had no specific business relations or transactions with him. Their interviews and observations were generally casual.

The proceedings before the surrogate and in the orphans' court of the county of Bergen, founded upon the offer of the will for probate, have not, nor has the result there, any importance in the present case. The apparent right of the devisee, as such, is dependent upon the due execution of the will, provable upon the trial. Corley v. McElmeel, 149 N. Y. 228, 43 N. E. 628. While the onus of proving the execution of the will was with the defendant, the plaintiff, making the attack upon it, assumed the burden of proving its invalidity in other respects. So far as his attack rests upon the fact of incapacity merely, it is found in the evidence already referred to. If the mental power of the decedent at the time he made the will was such as to enable him to appreciate and understand the nature, condition, and amount of his property, and his relation to those who were his kindred, and, in fact, to comprehend the nature and consequences of the provisions of his will, he had testamentary capacity. In re Snelling, 136 N. Y. 515, 32 N. E. 1006. This, upon the evidence, was a question of fact, which the trial court was not at liberty to withdraw from the jury. As the verdict was a general one for the plaintiff, it does not appear what view was taken by the jury of that question, if there was any other upon which they were permitted to reach that result. Feebleness of intellect insufficient to incapacitate

a person to make his will may render him more susceptible to control, and give greater opportunity for unduly influencing the testamentary disposition by him of his property. The charge was made to that effect in the present case.

It does not appear that the subject of making a will was ever considered by the decedent until after the death of his son. The daughter Julia was afflicted with consumption, and feeble. The evidence on the part of the plaintiff tends to prove that, soon after the death of the son, the defendant suggested the making of a will by her father, and asked one person to draw it, who declined; that thereupon, through her cousin Murray, one of the witnesses to the will, she caused the services of a lawyer to be procured for the purpose; that she was heard talking to her father about the making of a will, when she said to him that Minnie (the plaintiff's mother) did not need anything,—that she has enough, and, if she has not, let her go to work for it; and said something about the Quinn family (her family) being extravagant, and should not get their money to spend; that on another occasion she said to the witness that they were going to have her father make a will; that the boy (plaintiff) would get something, but not his father's share; that, when the young child of the plaintiff's mother died (shortly after his father's death), the defendant said she wished the other one (plaintiff) was dead too, as it would save trouble in the future; that both sisters talked about having their father make a will; that they did not want the widow of James or her boy to have any of their money; that they said this several times; that the defendant said on different occasions that the son's widow would not get any of the property if she could help it. There is evidence to the effect that the relations between the father and the son in his life were cordial and friendly; that the son collected the rents for his father; and that shortly before his son was married, in 1887, the father said of the girl he was about to, and did, marry. that she was a very nice girl, and, so far as appears, there was no interruption of friendly feeling between them while her husband lived. The remark said to have been made by the defendant to her father, after the son's death, that the widow and her family were extravagant, was repeated by him. This, so far as appears, was the only reason given for not making the grandson the object of substantial bounty by the will. The defendant was not a witness on the trial, and consequently the statements and transactions which the evidence tended to prove she made and saw, and in which she took part, were not controverted by any direct evidence to the contrary. The credibility of the witnesses giving the evidence was nevertheless a question for the jury.

Nobody had any legal claim upon the testamentary bounty of the decedent. His right was to make such a disposition of his property by will as he pleased. Whether wise or unwise in its provisions is not the subject for consideration, if it was his will. If he was non compos mentis, if it was the product of undue influence, the will was not his. But, in order to avoid a will on the ground of undue influence, it must be made to appear that the influence exercised, resulting in the will, amounted to moral coercion, such as to restrain inde-

pendent action, and deny free agency to the testator. Such influence as arises from gratitude, esteem, or affection does not come within the meaning of undue influence. It may be the result of importunity, which, if the testator is unable to refuse, or too weak to resist, constrains him to do what is against his free will and desire. Gardiner v. Gardiner, 34 N. Y. 155; Brick v. Brick, 66 N. Y. 144; In re Will of Mondorf, 110 N. Y. 450, 18 N. E. 256. While it is not indispensable that the evidence of undue influence should be made to appear by direct proof of its exercise, the circumstances from which it may be inferred "must be such as lead justly to the inference that undue influence was employed, and that the will did not express the real wishes of the testator." Marvin v. Marvin, 3 Abb. Dec. 192; Brick v. Brick, 66 N. Y. 144.

In view of the enfeebled mental condition which the jury were permitted to find was that of the decedent preceding and at the time the will was made, and in view of other facts and circumstances for their consideration, the question whether the will was the result of undue influence was one of fact for the jury. The facts which there was evidence tending to prove—that his mental condition was such that he and his actions were under and subject to the control of the defendant with whom he resided; that he was unable to resist her importunities or directions; that she suggested the making of the will, and procured its preparation; that its disposing provisions were substantially as she had stated they would be, making herself and her feeble sister the beneficiaries, to the substantial exclusion of the plaintiff from the testator's bounty—would, if taken as true, seem, under the circumstances, to have been sufficient to justify the inference that the will was the result of undue influence. Tyler v. Gardiner, 35 N. Y. 559; In re Budlong, 126 N. Y. 423, 27 N. E. 945; McLaughlin v. McDevitt, 63 N. Y. 213. The evidence of the subscribing witnesses and of the other person who was present at the execution of the will, if adopted as a correct representation of the situation, would seem to have indicated that the decedent was acting intelligently and freely without restraint. But the questions presented were peculiarly those for the jury, to whom the case was fairly submitted by the charge of the trial court; and the verdict does not seem so against the weight of the evidence, as the jury were permitted to view it, as to justify its disturbance on this review.

On the part of the plaintiff, a witness was called who was a clergyman, and had for three years had charge of the inmates of an insane asylum, in such sense as to visit them regularly as chaplain. He had called from time to time at the house of the decedent, and observed him in his relations to his family. This witness, however, I think, cannot be treated as an expert. After stating his observations of the decedent, he was asked to state his opinion, founded upon such observations, whether Ledwith was rational or irrational, and was permitted to answer the question. This was error. Paine v. Aldrich, 133 N. Y. 544, 30 N. E. 725. It was competent for the witness to characterize by opinion specific acts and conversations observed by him, as rational or irrational. De Witt v. Barly, 17 N. Y. 340; O'Brien v. People, 36 N. Y. 276; Rider v. Miller, 86 N. Y. 507. By

reference to the evidence of the witness, it is quite apparent that defendant was not prejudiced by the ruling, nor does there appear to have been error in any rulings on the trial to her prejudice.

The judgment and order should be affirmed.     All concur.