Stern, S.
I enter upon the determination of this case deeply impressed with the weighty responsibilities of my position and the magnitude of the interests involved.
The instruments propounded for probate as and for the last will and testament of Francis W. Tracy consists of five papers, a will and four codicils. The will, executed August 14, 1876, gives to his wife, Agnes Ethel Tracy, his dwelling house and all articles of personal property provided for use in and about the premises, and also one-half of the remain *240 der of Ms estate, real and personal. To Ms executors in trust the sum of $100,000, to be invested and the income applied semi-annually to the use of Ms daughter Harriet F. Tracy during her life, and at her decease the principal to be paid to her issue if any, if none then to the residuary legatee named in his will. The bequest in favor of his daughter he limits for the reason that her mother is possessed of an ample fortune.
To William Shelton, the income of $40,000.
To Anna Tracy Johnson, and Harriet Tracy, his cousins, each $30,000.
To the daughters of his cousin, Edward D. Tracy, and to Tracy Baxter, $15,000.
To his executors m trust, $7,500 to rnvest and to be used and applied to the maintenance and education of William Lansing, while, and so long as, he attends at either Tale or Harvard College. In case he attains the age of twenty-one years and graduates, the principal to be paid over to him. In case he fails to graduate before he is twenty-five, the principal to go to the residuary legatee.
To his executors, the residue of his estate in trust for any child or children born of his marriage with Agnes Ethel Tracy, the use to be applied during their minorities, and the principal on their attaimng the age of twenty-one years. In case of no issue said trust fund to be applied as follows:
To the Buffalo Orphan asylum, $10,000.
To the Buffalo General hospital, $20,000.
■ To the Charity Foundation of the Protestant Episcopal church in the city of Buffalo, $10,000.
To the Buffalo Historical society, $10,000.
To the Young Men’s association of the city of Buffalo, $10,000.
To the Buffalo Fine Arts academy, $100,000.
To the Home of the Friendless, $10,000.
To the Buffalo Catholic Institute, $10,000. The residue to Agnes Ethel Tracy.
By the first codicil, executed October 21, 1876, he revokes the bequest to his wife, Agnes Ethel Tracy, giving her all the residue and remainder of Ms estate, and provides that in case he should die leaving no issue of his marriage him surviving, and in case he should survive his wife, then he gives to Harriet F. Tracy, all and singular, the silver plate and plated ware of every description, to be delivered to her by his executors when she shall attain the age of twenty-one years, or shall be married. In case his wife survives him and his daughter, Harriet F. Tracy does not, the residue to go to his wife absolutely. In case he_ survives his wife and leaves Ms daughter Harriet surviving, then the residue to his executors in trust, the income to her during *241 her life, and the principal to her issue at her death. If no issue then to the residuary legatee.
In case his wife and daughter both survive him, then one-half to his wife absolutely, and the income of the other one-half to his executors in trust, the income to be paid to his daughter for life, and the principal to her issue, if no issue then to the residuary legatee.
The second codicil, executed August 19,1879, gives to his friend, Warren Bryant, $40,000, to be accepted in full satisfaction of all claims for commissions and compensation for services as executor and trustee under Ms will. It revokes the bequest of $100,000 to his executors in trust and substitutes a similar provision with the exception that oMy $3,000 of the income shall be used to educate, maintain and support his daughter until she is twenty-one, when she is to have all accumulations and thereafter during her life the entire income The legacy to the fine arts academy is reduced to $70,000, to construct a fire-proof building, and $50,000, if such building is otherwise provided for.
To the Buffalo general hospital an additional $30,000.
In contemplation of any early trip to Europe M company with his wife, he directs that in case both himself and his wife die under such circumstances that it cannot be determined who survives, then all the property devised and bequeathed to his wife by this will, and this codicil, he gives to Ms friend Warren Bryant. This codicil also contains the following provision : “In case any beneficiary named in my said last will and testament, whether devisee, legatee, or cestui que trust therein named, shall, in person or by another, contest the probate of my said last will and testament, or any codicil thereto, or shall institute any proceedings of any kind with a view to avoid or annul my said last will and testament, or any codicil thereto, or any provision in my said last will and testament, or in any such codicil contained, then, and m either case, I do hereby revoke all provisions in my said last will and testament or in any codicil thereto, contamed M favor of the person or corporation contesting or seeking to avoid such last will and testament, or codicil or provision, and if such contestant shall be my daughter, then I give, devise and bequeath to my wife all the property which in and by such last will and testament, and the codicils thereto, is or shall be given to my executors in trust for my said daughter’s benefit. If my wife shall be such contestant, then I give, devise and bequeath to my executrix and executors all the property which is by my said last will and testament, or any codicil thereto, given to my wife in trust for my daughter, and *242 upon the same trusts in every particular as are specified in the second article of this codicil.”
The third codicil, executed July 12, 1883, revokes the provision made in the first codicil for his daughter, giving her" the use of one-half of the residue of his estate, and restores the clause in his will giving the residue to his wife, and making her the sole and residuary legatee, and states that he makes this change in his intention respecting his daughter Harriet, after much reflection, and for the reason, among others, that he regards the provision made in her favor in the second article of his second codicil, when taken in connection With the provisions made for her in his mother’s will, as ample and sufficient under any circumstances. He revokes the bequest in favor of the fine arts academy of $70,000, and to the hospital of $30,000, made in the second codicil, and gives to the fine arts academy instead, $20,000, and directs that the money and property left to him under the will of his uncle, Edward Norton, be distributed among those of his uncle’s blood, per stirpes and not per capita.
By the fourth codicil, dated August 9th, 1883, in case his wife Agnes and he shall die at the same time, without issue them surviving, he gives to his wife’s sister, Rose Rodebush, and his wife’s niece and nephew, Agnes and John H. Rodebush, $100,000 each.
To his cousin, Anna Tracy Johnson, and Harriet Tracy, $75,000 each.
To the daughters of his cousin, Edward D. Tracy, $30,000 each, and to Tracy Baxter, $30,000.
He revokes the bequest in the second codicil to Warren Bryant, and further provides that in case he and his wife die at the same time, without issue them surviving, or in case of her death before him, subject to the provisions of his will, as modified by the codicils, he gives the rest, residue and remainder of his estate as follows :
Two-eighths to the Buffalo General hospital, and two-eighths to the Buffalo Fine Arts academy, and the remaining one-half in equal shares to the Buffalo Orphan asylum and to the Charity Foundation of the Protestant Episcopal Church in the city of Buffalo, the Buffalo Historical society, the Young Men’s Association of the city of Buffalo, the Home of the Friendless of the city of Buffalo, and the Buffalo Catholic Institute.
Had Mr. Tracy died without leaving a will, under the law, his personal property would be distributed one-third to his widow and two-thirds to his daughter. The real estate would descend to his daughter, subject to the dower interest therein of Mrs. Tracy.
The evidence briefly stated shows that Francis W. Tracy, *243 the testator, was born in the city of Buffalo in the year 1839, and died in April, 1886. He left a large estate, estimated at about $1,000,000.
Albert H. Tracy, his father, died in 1859, leaving a large estate, estimated at about $300,000. He left it to his widow, Harriet F. Tracy, and his two children, Albert Haller Tracy, and the testator, with the exception of a few legacies. Albert Haller Tracy, his brother, died in 1871, and gave all his property, amounting to about $200,000, to the testator. Harriet F. Tracy, his mother, died in March, 1876. With the exception of $25,000 to her granddaughter, Harriet F. Tracy, and some minor bequests, she gave her property to the testator. In the year 1862 the testator married Miss Mary Bobinson, daughter of Alanson Bobinson, a wealthy and well-known banker, and in 1867, the only child of this marriage, Harriet F. Tracy, was born. In 1871, Mrs. Mary Bobinson Tracy obtained a divorce from the testator, for Ms misconduct, and was awarded by the court the custody of the child. The testator sent the child to the mother and since then she has lived with her mother and her grandmother, Mrs. Alanson Bobinson.
In consideration for the testator’s release of all commissions for services and expenses as executor under the will of Alanson Bobinson, Mrs. Mary Bobinson Tracy released all claim of dower and alimony in his property. The testator married Agnes Ethel Tracy in 1873, and of this marriage there is no issue.
The friends and acquaintances of Mr. Tracy, nearly all of whom were prominent and highly respected citizens of this city, who met him at his own house and elsewhere during the last fifteen years, when he had been in the city, testify that aside from his habits of drink, he was a man of fine physique, noted for his appearance and bearing, a man who had a very accurate and tenacious memory; talked in a high key; clear, distinct and incisive, of an independent mind, of good judgment; a positive man, the best of conversationalists; methodic in business; jovial and genial; vigorous and strong in speech; clear headed; prejudiced in regard to men whom he liked and disliked; having a wonderful intellect; severe critic; a close observer; sympathetic, conservative, fond of telling and hearing stories; a good companion, fond of an argument, and the last to give up; particular in his personal habits; full of wit and humor; great power of detail in all things; good judge of a horse; a bold and nervy driver; fond of entertaining; courteous and affectionate; a strong friend, and an equally positive enemy; fond of using coarse expressions; light hearted, often affected to tears when speaking of his father, brother and mother; with a declamatory habit of *244 repeating over and over again verses and pieces that he had in a scrap book; fond of money, careful of his expenditures; reticent as to his business matters; not susceptible to in fluence; and that there was never observed anything to lead the witness to believe that he was of unsound mind or that his mind was enfeebled or had become deteriorated.
Some of his servants testify that he was peculiar, very childish, babyish, nervous, irritable, gloomy, melancholic, pleasant during drinking spells, but when sober restless, very peevish, seemed cross, and. would often cry; didn’t want to see anyone, was unreasonable, would ring them up and have them sit up with him at night; remarked often that he wished he was dead, or that he had not been born, and that nobody cared for him; was low spirited, could not sleep, would be up drinking, talking and walking all night; said that the men who passed by in the morning going to work were happier than he, that he could not stand it any longer, that he wished to Gfod that it would soon be over, that he did not enjoy life, and that the chances were one hundred to one that he would not see snow fly; that he would not open his mail until Mr. Bryant came, or open a telegram, that he did not have the nerve, that he might drop dead; would have to hold his hands at times when he was m bed; would flare up quickly and get into a p>assion, and all this seemed to them irrational.
Other servants testify on the contrary that he was kind and generous to his servants, sometimes impatient, but always considerate;, wanted to be well waited upon; was very humorous, fond of a joke; never saw him melancholy; and had no delusions.
Mr. Tracy drank intoxicating liquors to excess. He had strong convivial tendencies; drank with freedom; was difficult to get intoxicated; was at times under the influence of liquor sufficient to lose mental control, and incapable of attending to business; was clear and bright in the morning with no headache, after considerable drinking the evening before; had wonderful recuperative powers; was nervous and irritable; had periods of excess and of diminution, and of abstention; managed his large estate with good judg- . ment and with success, and had a complete knowledge of his affairs, financial and otherwise. When absent from the city his correspondence shows that he kept himself well informed on matters of public interest, and his own matters. He was at times low-spirited and depressed because of his illness, and because he hadn’t accomplished in his life what was to be expected of a man of his capabilities. He persisted in his mode of fife, with respect to the use of intoxicating liquors against the advice of his physicians. He said that drinking was a great comfort to him, and that *245 he wanted to get all the enjoyment he could out of life. In fact he enjoyed the pleasures and suffered the ills of hard drinking.
In 1883 Dr. Gillette says that he had the symptoms of a dypsomaniac. Dr. Lee says that he was suffering from the effects of chronic alcoholism in 1376. On the contrary, the testimony of Drs. Morrow, Keyes and Heywood, who' attended him in New York, and of Dr. Charles Cary, of Buffalo, who was on terms of social intimacy with him, and of Drs. Hopkins and Hill, for years his family physicians, is to the effect that Mr. Tracy was not a dypsomaniac- or a victim of chronic alcoholism, and that they never observed anything that led them to suspect that he was a man of unsound mind, or that his mental faculties were in any way enfeebled or deteriorated.
He was a victim to the wasting disease of diabetes, one feature of which was an insatiable thirst, which caused him to use large quantities of drink. His physicians told him in 1876 that unless he changed his mode of life, and discontinued the excesses in which he indulged;, he would live but a short time. But he lived for years beyond the' time marked for his dissolution.
About the year 1872, he had several interviews with his daughter, and manifested the feelings and affection of a-parent in various ways, among others giving her presents. Sometime afterwards he claimed that he could not see her, except in the presence of a servant, but he never spoke un-. kindly or in a derogatory manner of her. . For various reasons there were no meeting or intercourse after that time between father and child. In 1883 or 1884they passed each other several times on Fifth avenue in New York, but without any active recognition of each other. He made several wills previous to 1876, but no provision was made therein for his daughter. He was bound that none of his property should ever go to, or be enjoyed by his first wife, or come directly or indirectly under her control, but he expressed himself as being desirous of making such a provision for his daughter as would always keep her from want. He said that she would get. under the will an amount which equaled her share of his property had he died intestate at the time of the divorce of his first wife.
The special guardian contends: First—That the excessive use of alcohol leads to mental disorder, produces enfeeblement of the mind, and creates delusions, particularly in reference to the members of the family of the patient, as the result of which he becomes mentally incapable of making a will which shall affect them.
Second—That the facts in evidence show conclusively that Mr. Tracy’s mind was disordered, and that he was *246 under delusions of the kind that were to be expected from his mode of life.
Third—That the will is the product of this diseased mental condition.
I agree with the learned counsel for the special guardian, as to his first contention, with the exception that it is not in every case that the same result follows. From observation and reading on this subject, I know of men who at times drink excessively, manage their business and reach old age with minds unimpaired and vigorous. No rule can be laid down to determine how much the system can endure. Each case must rest on the character, qualities and condition of the person. It is a well-settled rule that persons who use intoxicating liquors excessively and habitual drunkards may still make disposition of their property when free from the influence of drink.
Hr. Tracy had not used intoxicating liquors to such an extent that his mental faculties were disordered or his judgment perverted, and if free from its influence he was in my judgment competent to make a will. The evidence shows that Hr. Tracy gave directions for drafting all these instruments presented for probate. They were the product of his mind. After his attorneys had drafted them they were submitted to him, and after mature deliberation were engrossed and read over to him again and then executed. At the execution of the will there were present, Mr. Dennis ¡Bowen, who is now dead, but whose memory and good deeds are still alive. He was the confidential counsel and adviser of the deceased. He was a gentleman who stood high in the estimation of this community. His sound sense, food judgment, legal ability and strict integrity were well-no wn; also Mr. Warren Bryant, the life long friend of the deceased, who were entrusted with the charge and management of his large estate, and who has for years been the president of the Buffalo Savings bank, a large and prosperous institution; also Dr. John D. Hill, the chosen medical adviser of the testator, a physician who stands high in his profession, and an estimable citizen; also Mr. Franklin D. /¡Locke, an able, competent and trustworthy lawyer and counsellor, whom the testator highly regarded as appears by his letters and who in conjunction with Mr. Bowen and Mr. Sherman S. Rogers drafted the will; also Mr. Ammi Cutter who is now dead, then managing clerk in the office of Bowen, Rogers & Locke.
The first codicil was executed in the presence of Mr. Bryant, Mr. Bowen, Dr. Hill, Mr. Locke and Mr. Cutter. The second codicil in the presence of Mr Locke and of Adolph G-. Frankenstein and Julius J. Erhlich, both intelli *247 gent young gentlemen, employed as bookkeepers in the Buffalo Savings bank, and also Mr. Bryant.
The third codicil was executed in the presence of Mr. Bryant, Mr. Locke and Dr. Henry B. Hopkins, able and learned and at that time Mr. Tracy’s physician, and William Johnson a clerk in the law office of Mr. Locke.
The fourth codicil was witnessed by Dr. Hopkins, Mr. Johnson, Mr. Erhlich, and in the presence of Mr. Locke and Mr. Warren Bryant.
Every person knows that it is impossible for a man who is excessively under the influence of liquor to transact business correctly and properly. We all know how impossible it is for a drunken man to feign sobriety and to deceive anyone of ordinary sagacity, but in this case Mr. Tracy was doing these most important acts of his life, under the eyes of his lawyers, physicians and the intelligent men who acted as witnesses. It was impossible to deceive them. And from their testimony it appears that Mr. Tracy was free from the influence of intoxicating liquors and could not have been laboring under any delusions that were apparent.
It also appears fully from the testimony that Mr. Tracy was perfectly familiar with the nature and contents of his will and the possible results in case of his death. So late as the autumn of 1884, his counsel Mr. Locke and Mr. Mi-bum at his request, and in his presence and in connection with his friend, Mr. William Dorsheimer, went carefully over the entire instrument to make sure of its validity. In 1878 Mr. Tracy wrote to Mr. Bryant the letter quoted by the counsel for the special guardian, and which I insert, as showing Mr. Tracy’s views at that time.
Royal Hotel, Blackebiabs, ) London, August 21, 1878. )
My Deab Fbiend [This letter is to Mr. Bryant]—Yours of the eighth, Mo. 108, should be numbered 107 (I have looked over the list carefully, so please make the correction and then we will keep along together) was received last night.
My dear little wife reached Liverpool Saturday morning the 17th. I was on the tender to meet her. I have been in Liverpool since Wednesday, the 14th. I meant to be on hand. Mrs. Tracy was very poorly, had been so much of the way over, and was quite sick, and confined to bed the day after the arrival.
On Monday we came on here and Mrs. Tracy has improved rapidly, and I trust, without care or anxiety, will before long regain her health and strength she had when she started on her recent long journey, but it will take some little time. I need not attempt to describe my delight and happiness since her return. One gala day it has been and will be.
On the 14th, upon my arrival at Liverpool, I found your letters Mos. 105 and 106, the latter containing the July account, which was gratifying. Your arithmetic is always charming. How can you make a saving of $16,000 when I owe $8,000 to the savings bank, is ahead of my Daboll, but it is sweet and pleasant as it stands.
I am very sorry the Chicago & Alton bonds are not registered; don’t know as I would have taken them had I known they were not; but when I go home, *248 if I ever should, “we can mark them,” as old Deacon Young used to say" about stoning a cat. Perhaps they have blank registers in them which the company will fill up; many of the old style of railroad bonds have, as I have bought bonds which have been in somebody’s name and transferred blank by the proper officers of the company. If this can be done I wish you would have it done when you return. I would gladly pay the expense of sending the bonds down and back. I know the room in your vault is in great demand and full requirement, and consequently am loath to ask this favor of you; but if you can arrange it, I will be much obliged. I wish you to get a box amply large for Mrs. Tracy’s securities, and have it plainly marked Agnes E. Tracy, as was the other, and keep in it all her effects which you have or may have. Under ordinary circumstances I would not care, but I think it wiser to have my wife’s by themselves, as well as the book you keep which might be lost or misplaced. Mr. Bowen told me to keep them separately, and 1 have heard other lawyers say it was the only way with anybody absolutely to prevent complications. For instance, in case of my death, it would not be improbable, if any one should attempt trouble, that an injunction might be immediately gotten out to restrain any one from handling or removing any of my securities until the probate of my will, and your powers as attorney would cease the moment I died, and I suppose technically, you would not have the right to collect a coupon or a dollar until you acted as one of my executors, or remove anything from a box of mine, even if it was yours, put there by yourself. I write thus fully to show how much an annoyance and trouble might be saved by keeping things distinctly by themselves. Of course you could show by yourself and your book that certain securities belonged to Mrs. Tracy, but in case of any issue, those facts would have to be drawn into court and be spread before the 'public, all of which can be entirely avoided and obviated by a separate box properly marked.
I do not anticipate any trouble. I do not think any first-class lawyer would advise anybody that my will could be molested, or in any way interfered with, as there never was one drawn with more care and precision, possessing the combined talent and legal knowledge of Bowen, Rogers & Locke, all of whom gave time, study and thought to it. Nothing will ever be attempted unless as “blackmail; ” but people fearfully reduced and becoming more and more so, I presume, and. of the belligerent and debased character of that Robinson tribe, may be in such condition as to attempt anything for never so small a sum, and with no chance they can find plenty of shyster lawyers who would start such a thing with the hope of getting something on a compromise. But never compromise for a cent. Whatever provisions the will contains for my wife could not, under any circumstances, be affected; as I would, apart from any relationship, have an indisputable right to give her as I might to you, Dr. Shelton, my cousins or any one. That feature could only be attacked upon the ground of my mental capacity to make a will, or for undue influence. Neither can any portions of it be assailed; but in large estates, their settlement is frequently being attacked wholly, entirely as “blackmail,” thinking parties in interest will pay to prevent publicity; but not one cent from my estate. “ Millions for defense, but not one cent for tribute.” I am like Mr. Tilden in regard to the late election frauds, “I insist upon the greatest publicity.”
Yesterday I ordered three suits of clothes and one overcoat, cost eighty thousand dollars, so “ that soup had been well gotten into me,” and I hope you will be pleased with my extravagance, and wish you could see me “with my new clothes on.”
Mrs. Tracy joins me in every good wish to you, and with hopes you are having a delightful time. I am truly yours,
F. W. TRACY.
The distribution of the testator’s property under these instruments may seem unreasonable, unfair and unjust, and the mind is involuntary led to prejudge this case. I feel a deep sympathy for Miss Harriet. She has been reared in luxury, and is bright and intelligent. Her father and mother were both wealthy, and it may seem that she had a *249 right to expect better treatment. But she is the offspring of a very unfortunate marriage, and in her absence, and through the separation, her father evidently lost his affection for her, and became indifferent toward her.
Courts cannot interfere to regulate the disposition of property after' the testator in his grave. They are not created for such purpose. It is the duty of the court to give effect to the testator’s intention when ascertained and to give it full force and effect. Every person who disposes of property by will expects and is entitled to that right, audit must be respected. The wishes of the dead are more sacred than the dispositions of the living.
The right of testamentary disposition is given to all except idiots, infants and persons of unsound mind. The law provides for the manner of execution, and restricts the testator’s power of disposition in respect to trusts, the creation of future estates, accumulations of income, charitable bequests and the dower of a widow. Otherwise he may do as he wishes.
In the case of Clapp v. Fullerton (34 N. Y., 197), Judge Porter says: “ The right of a testator to dispose of Ms estate depends neither on the justice of his prejudices nor the soundness of Ms reasoning. He may do what he wall with Ms own, if there be no defects of testamentary capacity or any undue influence or fraud; the law gives effect to his will, though its provisions are unreasonable and unjust.”
In Hagen v. Yates (1 Bern., 596), the learned surrogate says: “ He may be generous or not at his pleasure. May give none, may give part of, may give all to the members of his own family, may use Ms will for displaying Mndly or vindictive sentiments, may indulge if he choses Ms whim, Ms spite, Ms vamty, his ammosity to the top of his bent, and if he be not deficient m mental capacity, and is observant of the form which is established by law for the execution of testamentary instruments, his wish must be Mdulged by the court to the extent and judgment that they are to be effectual.”
In Wood v. Bishop (1 Dem., 512), the learned surrogate says: “The gratitude and the promptings of affection courts have always been careful to distinguish and discriminate in discussing and deciding questions of undue influence. The secret motives actuating a competent testator are not'always discernable, and are of themselves unimportant. The law of wills has for its foundation the right of every man to dispose of his property as he lists, however disordered and inequitable it may appear to others.”
In Hollis v. Drew Theological Seminary and others (95 N. Y., 172) Earl, J., says: “The general rule is that one *250 may do with his property as he pleases. He may dispose of it by will in any way that suits his fancy or judgment, may give it all to strangers, and thus disinherit his own relatives. He may give it to all natural persons or corporations capable of taking. He may give it directly or create trusts which the law allows, and this general power of disposition he possesses down to the last hour of conscious and intelligent existence.”
The widow, or husband, or heirs at law. and next of kin while entitled to the estate of the deceased under the laws of descent and distribution, have no vested rights. They are only entitled to what he wishes to give them and no more.
As to the second contention, upon the evidence I amfof the opinion that Mr. Tracy had no delusions as to his daughter. He may have had perverse opinions and strong prejudices, but he had no delusions, and his mind was not disordered.
Having passed upon the first and second propositions in the negative, I cannot but reach the conclusion that these instruments were the product of Mr. Tracy’s mind at a time when he was competent to make a will.
In conclusion, I desire to say that I regard a last will and testament as a most solemn instrument. It is not lightly to be set aside. The power of disposition of one’s property is among the dearest and most sacred of rights under our law. Because with my imperfect knowledge of the circumstances in any case, I feel that I might have made a different disposition, that neither affords, nor ought to afford, any reason why I ought to refuse probate. We are all entitled to an honest prejudice, and to have our own ideas of what is best and right, and neither the law nor the agencies of the law can or. ought to interfere with or defeat intelligent purposes solemnly witnessed and declared. A decree admitting the will to probate may be entered accordingly.