Barker, P. J.
The will was executed in due form, and all its provisions-are lawful. It is therefore for the contestants to make a clear case establishing the testator’s testamentary incapacity as a ground for denying the same probate. The testator’s property consisted mostly of real estate, being a farm, on which he lived, which was of the value of about $12,000, all of which he devised and bequeathed to his wife. Ho child of his survived him. Had the-testator died intestate, his heirs at law who would have inherited his real estate were his two brothers and two sisters, and several nephews and nieces, who-are the children of deceased brothers and sisters. The brothers and sisters, and two of the nephews and nieces, resisted the probate of the will upon the grounds—First, that the same was not freely and voluntarily made by the testator herein; second, that the same was procured by the circumvention and undue influence practiced on the decedent by his wife and others; third, that the testator had not testamentary capacity when the will was executed. The surrogate refused to probate for the reasons, as stated in the findings of fact, (1) that the instrument propounded for probate* was not the will of the-deceased; and (2) at the time of the execution thereof he did not possess testamentary capacity. On the argument of this appeal it was not contended by the respondents that the execution of the will was procured by the exercise of undue influence by Mrs. Keeler, or any other person, over the decedent; and the position is also abandoned on this appeal that the testator had not testamentary capacity at the time of making the will. If he was not,, then, laboring under the delusion that his brothers and sisters were unfriendly to him, and intended to rob him of his property, by these concessions the-questions of fact involved in the controversy, and to be determined by the evidence, are very much limited, and the questions of law which need consideration are not in serious dispute.
The will is dated 8th day of July, 1881. At that time the testator was 77' years old, and his wife was then 71 years of age, and totally blind. The testator died in 1886. He was a strong-minded, vigorous man; a good and successful farmer, which was his sole occupation; close and exacting in all his-business transactions; and suspicious of integrity of the men in his employ, who had access to the movable property on his farm premises. Up to a time-subsequent to the execution of the will he continued to manage, and carry on all his business operations with reasonable care and prudence, dealing with-the neighbors and the merchants residing in the village near his residence. During the latter part of his life, embracing a short period previous to date-of the will, his memory became somewhat impaired, and he was forgetful of some of his business transactions; and on a few occasions, as the evidence-discloses, he failed to recognize promptly, on meeting them, persons with, whom he was acquainted. The degree of mental and physical impairment, which he had suffered, as observed by friends and acquaintances, and described by some of the witnesses, was not exceptional, as compared with most men of his age, until within a year of his death, when he had an attack of paralysis or apoplexy. It does not appear from the evidence that the loss of mental power prior to the year 1884 was so great as to cause those with whom he had dealings to doubt his ability to manage his property with prudence, and his brother William, who is one of the contestants, had dealings; ’ with him of considerable importance. Mr. Keeler was at the time of his. death, and had been for 20 years previous thereto, a spiritualist, and believed, that he could communicate with the spirits of the dead, and that some off them at times appeared to him in a material form, and he was able to see therm *631 as in life, and to converse with them, and distinctly recognize their voices. Without repeating his statements as made to others, relative to the nature and extent of his belief as to the power and influence of the spirits of the ¡lead over the actions of the living, he appears to have adopted and have believed in most of the views of those who compose the class of persons known as “Spiritualists.” For many years previous to his death, and almost daily, seances w'ere held at his house, conducted by those who claimed to be mediums, and his home was frequented by those who believed with him on this subject, and by those vvho were curious to investigate the question as to the power of the living to communicate with the spirits of the dead, and to witness their material presence, if in fact that should occur. It was competent for the contestants to prove the belief of the testator on the subject of spiritualism, as expressed by himself, and the occurrences which took place at the ■seances held at the testator’s house, as bearing on the question of whether, at the time of the making of the will, he was under an insane delusion which influenced him in disposing of his property. The mere belief of the testator in the various phases of spiritualism, claimed by some to be nothing more than unfounded delusions, is not in and of itself sufficient to prove that a person so believing does not possess testamentary capacity. The delusion that will invalidate a will must point to actual unsoundness of mind, or, in other words, it must be an insane delusion. The court cannot say, as matter of law, that a person is insane because he believes in spiritualism, and that he can communicate with spirits, and can be directed by them in business transactions. Such beliefs do not in and of themselves afford a certain and reliable test of insanity and testamentary capacity. Whether a man’s religious views and opinions are true or mistaken is not the subject of judicial inquiry. The belief in spiritualism is at this time so common that the law must regard its followers, when their testamentary capacity is in question, the same as those who have a different religious belief. Brown v. Ward, 53 Md. 377; Robinson v. Adams, 62 Me. 369; Smith’s Will, 52 Wis. 544, 8 N. W. Rep. 616, 9 N. W. Rep. 665; Addington v. Wilson, 5 Ind. 137; Vedder’s Will, 14 N. Y. St. Rep. 470; Forman's Will, 54 Barb. 274; Bonard’s Will, 16 Abb. Pr. (N. S.) 128.
The learned surrogate based his decision on the fact, which he found established by the evidence, that the testator was influenced in making the will by the insane delusion that the Keeler family, who would have inherited his real estate if he had died intestate, were unfriendly to him, and were disposed to cheat and rob him of his property. If both of these facts, as thus stated, are supported by the proofs, then the decision of the court below should be sustained; for the law is well settled that if a person persistently believed supposed facts which have no real existence, except in his perverted imagination, and against all evidence and probability, and conducts his business affairs on the assumption of their existence, he is, so far as they are concerned, under a morbid delusion, and is an insane person. So if a person is influenced by an insane delusion to make a will disposing of his property differently from what he otherwise would, the same is void. Society v. Hopper, 33 N. Y. 619; Coit v. Patchen, 77 N. Y. 533. If, however, the delusion did not influence the testator in making a disposition of his property, and he was induced by other reasonable and rational considerations to dispose of it as provided in his will, then the will should be sustained, as its terms are dictated by a rational mind relative to the subject of disposing of his property. Every delusion is a false belief, but it is not every false belief that is an insane delusion. The evidence on which the contestants rely to establish that the testator was under, an insane delusion as to the state of feelings entertained by his brothers and sisters towards himself rests entirely in the statements made by the deceased as to his belief that it was their purpose to rob him of his property. No act of the testator’s, except the making of the will disinheriting them, is pointed *632 to as indicating on his part that he believed they entertained the purpose mentioned in the expressions which it was shown he uttered when speaking of them. These expressions were uttered in the presence of eight or ten different persons, on different occasions, during the period of some six years subsequent to the year 1879. I have examined the evidence with close attention, for the purpose of deciding in my own mind whether the testator actually believed that the feelings of his brothers and sisters towards him and his family were of the character which he in his statements relative thereto expressed them to be, or whether he uttered the remarks which he made for the purpose of expressing to those in whose hearing they were uttered his own ill-feelings towards them, based upon what he regarded as a social neglect on their part towards him and his wife because they were believers in spiritualism, and had entertained in their house those who claimed to be mediums, and others who were co-believers with them on spiritualism. On questions of testamentary capacity, courts should be careful not to confound perverse opinions and unreasonable prejudices with mental alienations. These qualities of mind may exist even in a high degree, and yet, so far as regards the view which the law takes of the case, the subject may be sane and competent to perform a legal act. The true test of insanity is mental delusion. Society v. Hopper, supra. If the testator was under a delusion as to the real state of mind of his brothers and sisters towards him, it is singular that he did not more frequently speak on the subject .that must have affected him intensely, and he would have been very likely to have done so if he had fully and firmly conceived an unbounded belief as to the intentions of the ICeeler family of the nature mentioned. As a general rule, when a delusion is entertained by a person, it is his main thought, and introduces itself upon nearly all occasions. It takes possession of the victim’s mind, and is the subject of constant conversation on his part whenever he can find listeners.
It appears that the testator and his brother lived near the same village, and that for many years there was but little social intercourse between the families, and it is disclosed by the evidence that the testator and his wife believed that their former and more intimate relations had been interrupted because they were believers in spiritualism, and held intimate association with those having like convictions. I am not fully convinced that the testator was led to make the reflections which he did upon the character and intentions of his brother because of any delusion. The expressions used by the testator towards his brother, as stated by the witnesses, are all of the same general tenor. To the witness Hiltz he said: “ ‘ The Keelers are going to try and rob me of every cent.’ I asked him what made him think so, and he said the spirits told him so. I told him that they had got all they wanted, and it didn’t seem possible they should do any such thing. He said he knew better; that Mrs. Eaton [meaning her spirit] had never lied to him yet. When he spoke of the Keelers he didn’t name any particular one, nor state any facts for his belief except that the spirits told him so. He said it must be so because the spirits told him so. I didn’t succeed in persuading him that they were not going to rob him. ” To each of the other witnesses the statements were substantially as follows: “He, the deceased, said the Keelers were trying to cheat him all the time, and the spirits told him so; and they were trying to get his property away from him, but they never should.” To one witness he said “that his brother was going to cheat and steal from him. ” And again, to another of the witnesses, he said: “My brothers are trying to rob me.” During the period in which these expressions were uttered the testator had some important business transactions with his brother without manifesting any reluctance to deal with him, or expressing any apprehension that his brother would cheat or overreach him.
If it should be conceded that it is established as a fact that the testator was under the delusion mentioned, the question still remains for thoughtful con *633 sideration whether he was influenced or controlled by the same in giving all his property to his wife, with a view of disinheriting his heirs at law, or was he prompted by his affection for his wife to give her all of his property? From the evidence bearing on the question, and the state of their health attending their declining years, I am persuaded that the testator, in disposing ■ of his property, was actuated by the latter consideration, and by a sense of justice and of duty imposed on him, owing to the great affliction from which his wife was suffering. They had been married and lived happily together for 50 years. She had assisted him in accumulating and preserving the property, which consisted chiefly of the farm which they had improved, and on which they had lived most of their married life. She was totally blind, and -to the last degree helpless, and the means which she might derive from her right of dower in his estate, had he died intestate, would scarcely have supplied her with the means to procure competent attendants to wait upon her and to supply her other wants. None of his blood relatives had any just claim on the bounty of the testator, as against an ample provision to be made by him for the comfortable and generous support of his wife. There is nothing in the nature and extent of the gift, under the circumstances, which would ordinarily indicate that the testator did not enjoy testamentary capacity. Unless the judicial mind, after a careful consideration of the question, is brought by the proofs to a firm and abiding conviction that at the time of the making of the will the testator was under an insane delusion, which influenced and controlled him to make the will, the same should be admitted to probate. There is reason for believing that the testator was moved only by his wish and desire, long entertained and frequently expressed to his wife and others, that it was his purpose to make a will, and give all his property to her. At least the question is involved so much in doubt that it presents a proper case to be determined by the verdict of a jury. If my brethren are of the same opinion, the decree should be reversed, and it will be unnecessary to examine the exceptions taken by the appellants to the reception and rejection of evidence on the hearing before the surrogate.
The decree is reversed, and an issue of fact on the material questions of fact in dispute are ordered to be tried before a jury at a circuit court to be held in and for the county of Cayuga, and the form of the issues are to be settled by the presiding justice, unless agreed upon by the parties, and the costs of these proceedings already had are to abide the subsequent proceedings to be had in surrogate’s court. All concur.