IN THE MATTER OF JAMES D. WHITE, Deceased. S. D.
WHITE, Appellant, *v.* ALIDA C. WHITE, Respondent.

*N. Y. Supreme Court, Fourth Department, General Term, May* 12, 1889.

1. *Will. Undue influence.*—In order to avoid a will on the ground of
   undue influence, it must not be the promptings of affection, the
   desire of gratifying the wishes of another, the ties of attachment
   arising from consanguinity, or the memory of kind acts and
   friendly offices, but a coercion produced by importunity, or by a
   silent, resistless power which the strong will often exercises over
   the weak and infirm, and which cannot be resisted, so that the
   motive is tantamount to force or fear.
2. *Same.*—To invalidate a will on the ground of undue influence, there
   must be affirmative evidence of the facts from which such influ-
   ence is to be inferred; it is not enough to show that a party
   benefitted by a will had the motive and opportunity to exert such
   influence; there must be evidence that he did exert it.
3. *Will.*—A will good, when made, will remain so until revoked or a
   new one is made.
4. *Will. Insane delusions.*—To create a delusion which will avoid a
   will, it is necessary that the conviction controlling the mind
   should be entirely unfounded, and persisted in against all evi-
   dence indicating that the facts assumed have no real existence.
5. *Same. Burden of proof.*—The burden of proving an insane delu-
   sion, which affected the will, is upon the contestant.
6. *Reversal. Section 2545.*—To justify a reversal of a surrogate's decree
   on the probate of a will, under section 2545 of the Code, it must
   appear that, had competent evidence, which was rejected, been
   received, the appellant's case would not have failed, or without
   improper evidence, which was received, the respondent's case was
   deficient.

Appeal from the decree of a surrogate admitting a will
to probate.

The will is dated July 20, 1885, and gives first to his

wife Charlotte White the use of one-half of his estate, both real and personal, during her natural life, then gives to his son Samuel Delos White $150, to be paid six months after his death, then gives to his daughter Charlotte Alida White the use of one-half of his estate, both real and personal, during the life of his wife, then after the death of his wife he gives the residue of his estate, real and personal, to his daughter, Charlotte Alida, and appoints his wife executrix. The testator died on the 22nd October, 1886, leaving him surviving, his widow, Charlotte White, and his two children, Samuel D. and Charlotte Alida, as his sole heirs at law and next of kin. The executrix propounded the will for probate, but since the appeal, she has died, and the administrator with the will annexed has been substituted as respondent.

*C. W. Underhill,* for appellant.

*Joseph Mason,* for respondent.

MERWIN, J.—It was claimed by the contestant in the court below (1) that the deceased was of unsound mind; (2) that the will was procured by undue influence; (3) that it was the product of an insane delusion with reference to the contestant.

The first proposition at to the general unsoundness is not pressed here. The evidence is of such a character that there is practically no doubt, but that up to a period after the making of the will, the deceased was, for general purposes at least, of sound mind, and so considered by all who dealt with him. He carried on and managed his farm, settled his accounts, and his business habits were substantially as they had been for many years. His conversation as to ordinary topics was rational.

The other two propositions are pressed here with a good deal of vigor, and involve a wide scope both as to evidence

and argument. The testator at the time of making the will, was about eighty-eight years old; had been a farmer for all or most of his life, and at his death his property consisted of a farm of about sixty-three acres, which he had occupied for many years, and was of the value of about $4,000, and personal property to the amount of about $2,500, consisting of farm stock, tools, and some money or securities. The contestant was a son of a former wife, and he had not lived at home since his arrival at manhood. He had obtained a profession and lived for twenty years or upwards at another locality in the same county, and had been reasonably successful in his business. The daughter, Alida, was unmarried, and always lived at home. The testator, at or about the time of the death of his first wife, had incurred large expenses by reason of sickness in his family, and there is evidence that he was then considerably in debt. The surviving widow had some property of her own, the amount does not appear.

The will in question was drawn by Mr. Northrup, who was a miller, and lived about a mile from Mr. White, and had been about twelve years a justice of the peace. He went to the house of Mr. White, apparently at the request of Mrs. White, and on his arrival there, Mrs. White called her husband in from the barn where he was at work. Upon his coming in, Northrup, as he testifies, told him he had come to do the writing he wished. " He said he wanted to change his will or add a codicil to it. I told him if he was going to change his will, he had better have a new one made; that if he would tell me how he wanted it changed, I would take it down on a piece of paper; he told me how he wished it changed; I took it down and read it to him, and he said it was correct; I took the old will and memorandum and came away. He wished me to stop at Mr. Isbell's and see if they would be at home, and he would go

13

down with me after I came up, and have them witness the will."

Northrup then went to his mill, drew the will, and after dinner went up to Mr. White's, read it over to him, asked him if it was correct, and he said it was; then Mr. White and Northrup got into Northrup's wagon and went to Isbell's; White went into the house and told Mr. and Mrs. Isbell he wanted them to witness his will, and he then signed it in their presence, declared it to be his last will, and they signed as witnesses, at his request and in his presence. Mrs. White was not there. In June, 1884, Mr. Northrup had drawn a will for Mr. White, which was witnessed by Mr. and Mrs. Isbell. This was similar to the one in controversy, except the amount given to the appellant was $250.

Mr. Northrup testifies that Mr. White gave as a reason for the change that his property had depreciated in value; that $150 was as good now as $250 a year ago. Mr. Northrup also testifies that at the execution of this will, he asked Mr. White "if he made this will, of his own free will, without dictation or influence from any one, and he seemed to be quite offended; he said he would have me understand that he made it of his own free will.   •

The will, in June, 1884, was executed soon after a quite severe sickness. Mr. Northrup was asked to go to the house by Mrs. White, she saying that he wanted a will drawn. Mr. Northrup upon his arrival found Mr. White lying down, but he got up and gave Northrup directions for the will, which Northrup took down in writing and read over to Mr. White, who said they were correct, and told him to have Mr. and Mrs. Isbell come up for witnesses. Northrup went home, drew the will, and the next morning returned with Mr. and Mrs. Isbell. The will as drawn was read over to Mr. White, and he said it was right. This was done in the presence of the witnesses and of Mrs.

White, and Mr. Northrup testifies that Mr. White asked his wife if that suited her, and she said yes, and he said very well then. Mr. Northrup also testifies that when he took the directions, Mr. White said the reason he did not give Delos but $250 was because he thought he had had his share of the property, that he had educated him and started him in business, and he understood he was well off.

It is shown that Delos, in or before 1856, received of his father $400, but the son claims that most of it was from the estate of his mother.

It seems that Mr. White first made a will in 1868. This was testified to by Mrs. White upon the examination of the contestant, and is corroborated by the witness Reese, called by proponent. Mr. Reese says that Mr. White then told him that he had made up his mind to make a will; that he had helped his son all he could afford to, and what he had left would go to his wife and daughter. Mrs. White says that the will then made gave her $2,000, to the son $200, and the rest to Alida, and if she did not live to legal age, to go to Delos. After the will of June, 1884, and in October of that year, as the witness S. P. Smith, who drew it, puts it, another will was made, in which, as the witness Smith testifies, he gave to his wife the use of all his property for her life, and at her death it was to be equally divided between his son and daughter, and in case the daughter died without issue, it was to go to the son, or his heirs.

At this time, according to the same witness, Mr. White said that the statute divided a man's property about as near equal as it could be divided, but he had promised his wife to make such a will, and he would make it; that his principal property had been accumulated before his marriage; that his wife was well off, worth twice as much as he was, and if he should give to Alida absolutely, it would go to the Seymour family, and he thought it ought to go to his family.

Spoke of having made a previous will when he was sick, and he said he was Capt. White yet.

This witness further testifies that the latter part of June or first of July, 1885, he drew two other wills for Mr. White, on succeeding days, which were executed—in the first one of which, $400 was given to the son, and the balance either equally to the wife and daughter, or $2,000 to the wife and balance to the daughter; and in the other one, $200 was given to the son, $1,000 to the daughter, and the balance to the wife; that upon this last occasion, Mr. White, speaking of the will of the day before, said, " that will not do; they won't have it. I have got to change it, they don't want Delos to have so much, they think he is not entitled to anything."

There is evidence of statements made by Mr. White before 1884, to the effect that the law made as good a will as any; that on one occasion, in 1882, he said, " if I was to make a dozen wills, I would serve my children all alike; that in 1874 he said he had paid off Delos, given him all he intended to; that a good many years ago he said Delos was worth more than he was, and he had done for him all he could then.

One witness, who was at the time at work on White's farm, testifies that on the 20th July, 1885, when Northrup came there, White was at or near the barn, examining a break in a mowing machine, and said to Northrup, " you have come, have you?" and did not then go into the house; that Mrs. White called him twice, and Mr. White said, "I wish I could be let alone a little while;" and in a little while Mrs. White came out and took him by the sleeve and said, " won't you come in now, we want you?" that he then went in with Mrs. White, and when he came out he was chewing violently, and suppressing tears.

Northrup testifies that he did not see Mr. White before going into the house; that he was then in a hurry, and

wanted Mrs. White to get Mr. White as soon as she could; that on this occasion the will he first drew was present.

We have thus far referred to the main features of the case bearing on the question of undue influence, aside from the matter of delusion. In order to avoid a will on the ground of undue influence, it must be shown that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist. It must not be promptings of affection; the desire of gratifying the wishes of another; the ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices, but a coercion produced by importunity, or by a silent resistless power which the strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear. *Children's Aid Society* v. *Loveridge*, 70 N. Y. 394, and cases cited. In *Cudney* v. *Cudney* ( 68 N. Y. 148 ) it is said that the declarations of a testator, alone, are not competent evidence to prove acts of others amounting to undue influence, but when acts are proved, such declarations may be given in evidence to show the operation they had on the mind of the testator; that to invalidate a will there must be affirmative evidence of the facts from which such influence is to be inferred; it is not enough to show that a party benefited by a will had the motive and opportunity to exert such influence; there must be evidence that he did exert it. In the present case, facts sufficient are not shown to authorize the inference of any undue influence within the rule above given. The directions for the will in question, as well as for the one of June, 1884, on which it was based, were given by the testator solely and intelligently. There is no evidence of any importunity on the part of the wife or daughter. Suppose the

wife requested that she should be given a life estate in the whole property, there was nothing improper in that, as long as the husband acted from his own free will. The character of the man, as developed by the evidence, was such that very evidently his will was the strongest of the three. Although old, he was strong physically and mentally, and, as a witness on each side says, he was a remarkable man of his age. The will as made was in harmony with his general intention as declared before. True, there is very material difference from the will of October, 1884, but that differed as materially from the will of June, 1884, and from the will of 1868. It was not unnatural that more should be given the daughter than the son.

Was there an insane delusion that affected the will? The basis for the claim in this matter was a dispute as to the true location of the line between the farm of Mr. White and that of his neighbor on the north, Mr. Lewis. In the northeast corner of Mr. White's farm there was a wood lot, which upon its outer sides had not been fenced by Mr. White. It had been treated by him as land open to the commons. In July, or fore part of August, 1884, there had been a survey by a Mr. Townsend, of the line between Mr. White and his neighbor on the west, Mr. Wetmore. At this time Mr. White had his north line run out, but in the woods it did not come as far north of the fence there as he thought it ought to.

He afterward visited his son, talked with him about it, was advised by him that he would have to build his share of the fence adjacent the wood lot, and at his suggestion a surveyor by the name of Campbell was employed to run another line. This was done on the 9th, August, 1884, but the line was run substantially the same as run before by Townsend. About this time or soon after, Mr. White seems to have been advised by some other attorney that he was not obliged to build any fence opposite the woods.

From this time forward, it is shown that on many occasions Mr. White said that Lewis and Campbell and Wetmore, and his son, Delos, were trying to get up a conspiracy to cheat him out of his land and not run his land right; that they were all masons and were together because they were masons; that Delos ought to have known better, but was just as bad as they; that they were all rascals, and he talked excitedly: that his son recommended Campbell and was to blame for it; that there was fraud and deception on the part of the four named; that Delos was a rascal and scoundrel, and had lied to him about the fence; that other lawyers knew as much as he did, and he would not build the fence unless he was obliged to; that his neighbors were combined against him, were combined as masons, and Delos was a mason and was against him, and combined with his neighbors. Expressions of this kind were more or less frequent up to October, 1886. Nothing further was done about the line fence. There was no conspiracy against Mr. White. The line was, in fact, run correctly, according to the evidence of the surveyors. Lewis, Campbell and Delos were in fact masons. Mr. White, from early life, had been accustomed to speak very harshly of the masons. He was a man of strong prejudices, was in the habit, as a witness for the contestant testifies, of speaking in very opprobious terms of those who differed from him, though he would want to part friends; was harsh and severe in his manner.

In the fall of 1884, at a discussion of the line matter, when his son was present, he was apparently irritated at the manner of his son, and the latter wrote him a letter on the 20th May, 1885, in which expressions were used that probably irritated the father. In his conversations with his neighbors he sometimes referred to this matter, and sometimes not. It was not referred to when the last will was made. There were other times when the son was spoken of, that it was not referred to.

His son did not visit him in the winter of 1884 and 1885, and gives as a reason that he was sick. He did visit him in May, 1885. His father was then angry at him, would not respond to his friendly advances, thought he had deceived him in his advice about building the fence, and thought he ought to have come and looked after the second survey.

These were the main features of the case up to the time of the making of the last will. What occurred afterwards is not very important. If the will was good, when made, it remained so until revoked or a new one made.

In Seamen's Friend Society *v.* Hopper, 33 N. Y. 619, it is said by Judge DENIO, that a person, persistently believing supposed facts, which have no real existence, against all evidence and probability, and conducting himself upon the assumption of their existence, is, so far as such facts are concerned, under an insane delusion, and if a testator at the time of making his will, is laboring under any such delusion in respect to those who would naturally have been the objects of his bounty, and the court can see that the provisions of the will were or might have been caused or affected by such delusions, the instrument is not to be deemed his will, but courts should be careful not to confound perverse opinions and unreasonable prejudices with mental alienation. In Clapp *v.* Fullerton, 34 N. Y. 190, it was held that it was not sufficient to justify the rejection of a will that a testator, in other respects competent, entertained the mistaken idea that one of his daughters was illegitimate, if it was not the effect of insane delusion, but of silent and inadequate evidence acting upon a jealous and suspicious mind, it being said by Judge PORTER that the right of a testator to dispose of his property depends neither on the justice of his prejudices nor the soundness of his reasoning.

In Leslie *v.* Leslie, 15 N. Y. W. Dig. 56; affirmed in 92 N. Y. 636, on opinion of court below, it was held that, to create a delusion which will avoid a will, something more than an unwarranted conclusion from existing facts must

be shown; it is not enough that exaggerated opinions may have been formed, but it is necessary that the conviction controlling the mind should be entirely unfounded, and persisted in against all evidence indicating that the facts assumed have no real existence; that when a will has been made under an assumption of inferences deduced from circumstances only colorably supporting them, it cannot be set aside as the work of an insane mind.

See also Coit *v.* Patchen, 77 N. Y. 533; Keeler *v.* Keeler, 20 State Rep. 439. The Barden case, reported as Lathrop *v.* Am. Board of Foreign Missions, 67 Barb. 590, is not very analogous to this. There the testator had been previously insane and confined in an asylum, was a chronic and confirmed monomaniac in respect to the masons and fears of loss of property and life from them, and was found by the surrogate to be actually *non compos mentis.* Here, after making the proper allowance for extravagance of expression, which was characteristic of the testator, we have his statements to the effect that his rights as to his boundary line were being infringed upon, and that his son was helping it along, because he and the other parties were masons.

His conclusions were not correct. He was undoubtedly irritated against the son; there was, on his part, prejudice and anger; he thought his son had not treated him right; had not advised him right about building the fence. His construction of the acts and talk of his son led him to speak harshly and angrily, but all this does not prove an insane delusion. It was rather the case of unreasonable prejudice and perverse opinion. The subject-matter of the controversy, a boundary line, was one about which sane men are liable to waste time and temper and means over insignificant values.

The burden of proving the existence of an insane delusion, that affected the will, was upon the contestant. A reasonably clear case must be presented. As said in the

Keeler Case, above cited, unless the proofs submitted lead the judicial mind to a firm and abiding conviction that the testator, at the time of making the will, was under an insane delusion, it should be admitted to probate.

Upon the whole, we are of the opinion that the surrogate correctly held that no insane delusion was established that affected the will.

At the time of making the will, the eyesight of the testator was impaired, so that he was not able to read, and the point is made by the appellant that it is not sufficiently shown that the testator knew the contents of the paper he signed. Mr. Northrup, who drew it, testifies he read it over to the testator, at his house, and then he and the testator went to the house of the witnesses, where it was executed. It was not read over then, but there is nothing to throw doubt upon the evidence of Mr. Northrup, that the same paper that was read over was executed. The testator was apparently with Northrup from the time it was read over till his execution. There is no circumstance of suspicion about it. The surrogate was satisfied with the evidence of Mr. Northrup on the subject, and we see no reason to disturb his conclusion.

Some exceptions to rulings upon evidence are presented by the appellants. In Snyder v. Sherman (88 N. Y. 656). it was held that, under section 2545 of the Code, to justify a reversal it must appear that, had competent evidence, which was rejected, been received, the appellant's case would not have failed, or without improper evidence, which was received, the respondent's case was deficient. Within this rule, no cause is shown for reversal on such exceptions.

It follows the decree of the surrogate should be affirmed, with costs.

All concur.