In the Matter of Proving the Last Will and Testament of SIMON FOLTS, Deceased.

*Execution of a will — contemporaneous signature of the testator on another paper — testamentary capacity — non-expert opinions — executor as a witness to personal transactions with the testator.*

On the signing of his will by a testator seventy-four years of age, there were some imperfections in the spelling of his signature, subscribed in the presence of the attesting witnesses. The testator wrote his name on another piece of paper simultaneously with the execution of the will, which paper one of the attesting witnesses preserved and produced at the hearing before the surrogate, upon a contest over the admission to probate of the will on the ground, among others, that it was not duly executed.

*Held*, that this piece of paper was properly received in evidence, in connection with the witness' testimony, as part of the *res gestæ*.

On the contest as to the admission of the will to probate, on the grounds, among others, of lack of testamentary capacity and the presence of undue influence, the evidence showed that the testator was a laborious farmer during the larger portion of his life ; that he was prosperous and accumulated the property of which he died possessed, and that he had not only physical vigor but considerable intelligence and ability, but that towards the latter years of his life he had become accustomed to depend to a considerable extent upon the advice and suggestions of his wife. There was evidence on the part of the contestants

to the effect that there were days when the memory of the testator was in a more or less impaired condition, and that following such days there would be days on which he would be in better condition of mind and memory. It appeared that the will accorded with previous declarations made by the testator in respect to the disposition of his property.

*Held* — applying the rules that the fact that an aged person is forgetful and at times labors under slight delusions does not *per se* establish want of testamentary capacity ; that there is no presumption against a will because made by a man of advanced years; that testamentary incapacity cannot be inferred from an enfeebled condition of mind or body ; and that the burden of proof is upon the proponents of a will to show by *prima facie* proof a testamentary capacity at the time of the execution of the will — that the evidence did not establish that the testator's disposition of his property was produced by improper influences, or that he was laboring under an insane delusion at the time of the execution of his will; and, hence, that findings by the surrogate of the existence of testamentary capacity and the absence of undue influence should be sustained.

Persons not experts, after testifying to facts and incidents in relation to a testator, tending to show soundness of mind or the contrary, may testify to the impression produced upon them thereby, and also whether the acts and declarations testified to seemed to them rational or irrational, but they may not testify as to the general soundness or unsoundness of mind of the testator; the testimony must be limited to the witness' conclusions from the facts testified to by him.

On a contest as to the admission of a will to probate, the mere fact that a witness is the executor of the will, and, therefore, interested in the estate to the extent of his fees, does not render him incompetent, under the Code of Civil Procedure, to testify, on behalf of the proponents, to transactions had with the testator, bearing upon the question of the due execution of the will.

APPEAL by the contestants, Lovina Whaley and others, from a part of the decree of the surrogate of Jefferson county, made on the 29th day of May, 1891, and entered in the office of the surrogate on that day, admitting the will of Simon Folts, deceased, to probate.

March 31, 1890, Russell B. Biddlecom, of the town of Orleans, named as executor in the will of Simon Folts, presented a petition to the surrogate of Jefferson county, requesting that citations be issued addressed to the heirs and next of kin of the deceased to attend a probate of his will ; and on the second of June a supplementary petition was filed, and upon the return of citations on the 27th of June, 1890, Lovina Whaley, Lucy A. Baxter, Harvey Folts and others, heirs at law and next of kin, objected to the probate of the instrument presented and propounded as the last will and testament of the deceased, on the following grounds :

*First.* That the instrument was not published according to law,

and " was not in fact duly and legally made, executed and published, and is invalid and void."

*Second.* " That said instrument was not in fact made, executed and published by said deceased, and is not his last will and testament."

*Third.* " That said instrument is not a legal and valid will and is not the free act and deed of said deceased."

*Fourth.* " That at the time said instrument is alleged to have been made, executed and published, said deceased was not of sound and disposing mind and memory, and was incompetent to make, execute and publish a valid will."

*Fifth.* " That at the time said instrument is alleged to have been made, executed and published, said deceased had lost his mind and memory, and could not write or speak intelligently; and said instrument was not signed, executed or published by said deceased."

*Sixth.* " That the alleged making, execution and publication of said instrument was instigated, obtained and procured through and by means of undue influence, artifice, duress and fraud practiced upon said deceased, and said alleged will is not, therefore, the free and voluntary act and deed of said deceased, and is invalid and void."

Voluminous evidence was taken before the surrogate, and on the 29th of May, 1891, he made his decision thereon and found as matters of fact, viz. :

" 1. That the testator, Simon Folts, at the time of the execution of the will in question, on the 7th day of January, 1889, the day of the date thereof, had testamentary capacity to make a will disposing of his property, real and personal.

" 2. That said will presented for probate was duly executed in compliance with the statutes in regard to the execution of last wills and testaments.

" 3. That said will was drawn by Russell B. Biddlecom in strict compliance with instructions received by said Biddlecom from Simon Folts solely, and was read over by said Biddlecom to said testator just prior to the time it was signed and executed by testator on the day of the date thereof.

" 4. That the testator comprehended, knew and understood fully the contents of said will, and the disposition therein made by him of his property, real and personal, at the time of the execution thereof.

" 5. That he was not under any restraint, and was in the enjoyment of his mental faculties, uninfluenced by any person or persons, and was in all respects competent to make a testamentary disposition of his property.

" 6. That said testator signed his name at the end of said will, on the day of the date thereof, and thereafter, and on the same day, each one and all of the subscribing witnesses to said will signed their names thereto respectively, each at the request of said testator, and in his presence; the witnesses Spencer and Dale signed in the presence of each other; the witnesses Scoville, Marshall, Linkenfelter and Beardsley signed in the presence of each other."

The surrogate decided as matters of law, viz. :

" 1. That said will must be admitted to probate.

" 2. Therefore, let a decree be entered herein, admitting said will to probate, and establishing and confirming said will as a good and valid will of real and personal property, and awarding letters testamentary thereon to the executor named therein, said decree to be entered of even date herewith."   And on the same day a decree was entered, admitting the will to probate, and decreeing that letters testamentary issue to the executor named in the will, and that the expenses and costs of proponents " be paid out of the estate of said deceased," and fixing the sum thereof at $295.86.   June 9, 1891, exceptions were served and filed.   June 25, 1891, Lovina Whaley, Lucy A. Baxter and other heirs at law appealed from the whole of the decree " except so much as awards costs and expenses to the parties who appeared and presented said will for probate."

*Porter & Walts*, for the appellants.

*Hannibal Smith*, for the respondents.

HARDIN, P. J.:

Simon Folts was born near Little Falls, in Herkimer county, September 1, 1815, and when about twenty years of age his father removed to Jefferson county, where the deceased resided until the time of his death, which occurred at Lafargeville, on the 17th day of March, 1890, at the age of seventy-four years and six months. Jane Folts, his wife, died in November, 1888.   The testator, at the time of his death, owned about 600 acres of land, supposed to be

worth in the neighborhood of forty dollars an acre, and certain personal property, making the aggregate of his estate, both personal and real, worth about $30,000. His only heirs and next of kin were his sisters, Catherine Budlong, Lovina Whaley, Salome E. Folts, Lucy A. Baxter, and the children of David Folts, a deceased brother, and the children of Eliza Witherstine, a deceased sister. By the terms of the will, one-half of the real and personal property was devised and bequeathed to Gideon N. Budlong, Lucy Budlong and Salome E. Budlong, the children of Catherine Budlong; and one-fourth of the estate, real and personal, was bequeathed and devised to the children of his deceased brother, David Folts; and the other one-fourth was bequeathed and devised to the children and descendants of his deceased sister, Eliza Witherstine. The will contained no provision in favor of his sisters Lovina Whaley, Lucy A. Baxter and Salome E. Folts. He had resided upon his farm lands until the fall of 1888, when he purchased a house and lot in Lafargeville, and removed thereto, in which he remained until the time of his death. His wife Jane had a short illness in November of that year, when she died. Before her death she had made a will in his favor and he had made his will in her favor. On the 6th day of December, 1888, the testator executed and delivered a power of attorney to Russell B. Biddlecom, giving him "general control and supervision over all the lands" belonging to him in Jefferson county, to "collect and receive all dues, notes and rents, and invest as he may deem proper all moneys he may receive into his hands." On the 13th of August, 1888, the testator and his wife joined in a lease to Josiah Sayles of the 600 acres of land situated in the town of Orleans, then occupied by Sayles, for the term of five years, at an annual rental of $1,200, containing numerous stipulations not necessary to state. On the 7th of January, 1889, the testator executed his will at the residence of his sister, Mrs. Budlong, in Lafargeville, which was prepared by Mr. Biddlecom, the executor, at the request of the testator. Before the same was executed Dr. Spencer of Watertown arrived at Lafargeville, and after dining with Dr. Dale, visited the house of Mrs. Budlong in company with Dr. Dale, and there found the testator and Mr. Biddlecom, and a protracted conversation was had between the deceased and the physicians in the presence of Mr. Biddlecom. When the physicians arrived at the house the conversation was

opened by the testator indicating to them that he was aware of the object of their visit, using the following words : " I (you) came for the purpose of finding out whether I (he) knew enough to make a will." Near the close of the conversation, the physicians having reached the conclusion that the testator was competent to make a will, the same was produced by Mr. Biddlecom and was read over to the testator in its entirety, and certain portions of it were reread and the provisions thereof repeated to the testator, and he avowed that he understood the same, and that the will was in accordance with his wishes and desires, and thereupon he sat down to a table, which was prepared for the purpose of the execution of the will, and took his pen, and finding some little difficulty as to the flow of the ink, the pen was replenished by the hand of Mr. Biddlecom, and in the presence of the three persons the will was subscribed, (there were some imperfections in spelling the signature of the testator), and he thereupon declared the same to be his last will and testament, and requested the two physicians to become subscribing witnesses thereto. The attestation clause was prepared, and in the presence of the testator, and at his request, the two physicians affixed their signatures below the attestation clause. It seems that the testator wrote his name on another piece of paper simultaneous with the execution of the will, which Dr. Spencer preserved and produced at the hearing before the surrogate, which was received in evidence, we think properly, in connection with his testimony as a part of the *res gestæ.* (*Matter of Coleman*, 111 N. Y. 227.) Apparently when the parties separated, the will having thus been subscribed by the testator and the two physicians, was retained by Mr. Biddlecom from the close of that interview, which was probably well on in the afternoon, until about seven o'clock in the evening, when four persons, in pursuance of a request, met the testator and Mr. Biddlecom, and in the presence of those four persons the testator acknowledged the execution of the will, and declared it to be his last will and testament, and requested the four persons, Scoville, Marshall, Linkenfelter and Beardsley, to witness the same, and they thereupon, in his presence and in the presence of each other, subscribed their names to a second attestation clause written just below the one subscribed by the physicians. Thereupon the

executor took the will, folded it and put it in an envelope, and handed it to the testator, who thereupon returned it to the executor, with a request that he keep the same safely for him, and he did so apparently until the occasion when it was produced in the Surrogate's Court. Upon the hearing before the surrogate the two physicians were called in behalf of the proponents, and narrated all of the facts and circumstances occurring in their presence in respect to the execution of the will; the executor was also sworn as a witness, and he narrated the facts and circumstances attending the execution of the will in the presence of the physicians. After giving the facts and circumstances thus transpiring, these three witnesses vouched for the capacity of the testator, and in differing language expressed the conclusion that his acts and conversations impressed them as the acts and conversations of a rational man. They fully sustain the essential facts to warrant the belief that the testator was competent to make a will and that his " act was free, voluntary and intelligent." (*Children's Aid Society* v. *Loveridge*, 70 N. Y. 387; *Horn* v. *Pullman*, 72 id. 270.) The testimony of the four witnesses to the acknowledgment to the execution of the will, in the evening of the day the physicians attested the will, was produced, and after detailing the facts and circumstances appearing at the time of the acknowledgment of the will in their presence, and their subscription of the attestation clause, they freely state, in substance, that from their observations and from what transpired in their presence, the acts and utterances of the testator impressed them as being rational. Many other witnesses were called during the progress of the hearing before the surrogate, who detailed facts and circumstances appearing in their presence antecedent to the execution of the will, illustrative of the bearing, conduct, acts and intelligence of the testator. After detailing those facts and circumstances they have expressed the opinion that the acts and utterances of the testator were those of a rational person. It was conceded by the contestants during the trial that the testator was competent up to 1885. To meet the evidence of the proponents, to sustain the allegations of the contestants, numerous witnesses were called before the surrogate to testify as to facts and circumstances within their knowledge and observation relating to the physical and mental condition of the testator prior to the time of the execution of the will, and also as to his condition subsequent to its

execution, and they were allowed, after giving their observations and knowledge of acts and events transpiring in their presence, to express their opinion in accordance with the rule in *Clapp* v. *Fullerton* (34 N. Y. 190), and they stated that, in their opinion, the acts and conversations of the testator impressed them as being irrational. From the evidence given it appears that the testator was a laborious man during the larger portion of his life, and that he was prosperous and accumulated the property of which he died possessed, and that he had not only physical vigor, but considerable intelligence and ability, and that he had received the respect of his neighbors, and was regarded as a man of capacity and success as a farmer. Towards the latter years of his life he had become accustomed to depend to a considerable extent upon the advice and suggestions of his wife. Apparently, from the evidence given on the side of the contestants, there were days when he was in more or less impaired condition of memory, and following such days would be days in which he was in better condition of mind and memory. Doubtless, when the witnesses speak of his condition, when they say his acts were those of a rational, intelligent, unimpaired mind, they saw and observed him on his better days, and many of the observations and acts which impressed the witnesses who were called to say that their impressions were that his acts were not rational, transpired on his poorer days; that he should have "good days" and "poor days" is not at all a contrary condition in which persons in advancing years are found. In considering the evidence given by the proponents, and the evidence given by the contestants, notwithstanding some of the imperfections and irrational acts detailed by the witnesses for the contestants, it must be borne in mind that "the fact that an aged person is forgetful, and at times labors under slight delusions, does not *per se* establish want of testamentary capacity" (*Children's Aid Society* v. *Loveridge, supra*); and that it must be said that there is no presumption against a will because made by a man of advanced years; "nor can incapacity be inferred from an enfeebled condition of mind or body (*Horn* v. *Pullman*, 72 N. Y. 276); and it must also be borne in mind that the burden of proof is upon the proponents to show by *prima facie* proof a testamentary capacity at the time of the execution of the will. (*Matter of Ramsdell*, 20 N.

Y. St. Repr. 448.) After a protracted examination of the evidence found in the appeal book, and applying the rules referred to in the cases to which allusion has been made, as well as others bearing upon the subject, the conclusion is reached that the findings of the surrogate are sustained by the weight of the evidence upon which he was called upon to act in respect to the capacity of the testator at the time of the execution of the will. The will accords with previous declarations made by the testator in respect to the disposition of his property. Nor do we think that a case of undue influence was made out by the testimony furnished before the surrogate. (*Brick* v. *Brick*, 66 N. Y. 144.) Nor that his disposition of his property was produced by improper influences. (*Carpenter* v. *Soule*, 88 N. Y. 257; *Matter of Will of Martin*, 98 id. 193.) Nor does the evidence show that the testator was laboring under an insane delusion at the time of his execution of the will. (Opinion of MERWIN, J., in *Matter of Will of White*, 5 N. Y. Supp. 295; S. C., 121 N. Y. 406.) The foregoing views lead us to agree with the surrogate in his conclusions of fact stated in his decision upon which the decree was entered. The learned counsel for the appellants upon the argument and in his brief, has called our attention to some exceptions taken during the trial before the surrogate. Scoville, one of the witnesses called for the proponents, who subscribed the second attestation clause, gave the facts and circumstances transpiring on the occasion of his subscribing his name, and the following question was propounded to him: "Q. What do you say from the acts that occurred that night, the acknowledgment of Mr. Folts to this will, the signature and your witnessing there? What do you say as to whether those acts and words of Mr. Folts, whether he was sane?" This was objected to by the contestants on the ground that it was incompetent and immaterial; and, second, "It appears the will had been drawn and executed prior to this time, and that the condition of the man is not competent with a view of establishing his mental capacity for executing the will prior to this time." The objections were overruled and an exception taken, and thereupon the witness answered, "I should have to say he was, as far as I could ascertain from anything that I could see." Marshall, another of the subscribing witnesses, was called, and testified to the acts and declarations occurring at the time of subscribing the second attesta-

tion clause, and there was propounded to him the following question : " Q. What do you say as to the declarations and acts of Mr. Folts on the occasion of the acknowledgment of this will, this signature and the witnessing there on that occasion. What do you say as to whether he was sound or not ? " This was objected to on the ground that it was incompetent and immaterial and witness was not competent to give his opinion. The objections were overruled and an exception taken. Thereupon the witness answered, " I saw nothing to the contrary." Linkenfelter, another subscribing witness, was called, and detailed the circumstances occurring at the time of the subscription of the second attestation clause, and the following question was put to him : " Q. What do you say from the acts and words and appearance of Mr. Folts on this occasion, and the acknowledgment of this will, and the request for your witnessing it, whether he was sane or not ? " This was objected to as incompetent and immaterial, and that the question is not proper and witness is not shown competent to testify upon the subject. The objections were overruled and an exception taken. The answer of the witness was, " I should take the ground that I was not competent to say whether a man is competent, but he sat there and answered the questions all right that Mr. Biddlecom asked him and appeared all right and natural." Thereupon the following question was propounded : " Q. I am talking about these acts. What do you say from what you observed there in reference to these acts ? " "A. His acts were all right ; he sat there and answered the questions ; he appeared all right, I will say that." In considering the objections made to the evidence it is to be observed that no specific objection was taken that the witness " is not legally competent to express an opinion on the general question whether the mind of the testator was sound or unsound." (*Clapp* v. *Fullerton*, 34 N. Y. 195.) The answers given by the witnesses indicate that they did not understand they were called upon to express their judgment generally as to the testator, but rather to express the impression produced upon them there made by the acts and circumstances transpiring on the occasion of the acknowledgement of the will.

In *Paine* v. *Aldrich* (133 N. Y. 544), where the rule in respect to the opinions of witnesses was under consideration, it appears that the trial court allowed the following question : " From the conver-

sations you had with him and from his actions, his acts in your presence, were those conversations or those acts those of a rational or an irrational man?" which the witness answered in his own way; that rule was approved and is in accordance with the rule as stated in *People* v. *Conroy* (97 N. Y. 62), where it was said: "To render the opinion of one not an expert competent in such a case, it must be limited to his conclusion from the specific facts his testimony discloses."

In *Hewlett* v. *Wood* (55 N. Y. 634), it was said, viz. : "Persons not experts, after testifying to facts and incidents in relation to a testator, tending to show soundness of mind or the contrary, may testify to the impression produced upon them thereby, and also whether the acts and declarations testified to seem to them rational or irrational, but they may not as to the general soundness or unsoundness of mind of the testator."

In *Holcomb* v. *Holcomb* (95 N. Y. 316), the rule was discussed and it was again asserted that the "testimony must be limited to his conclusions from the facts testified by him."

(2) We think the ruling made in the course of the cross-examination of the witness Linkenfelter presents no error. Before the witness left the stand he was permitted to testify all he was competent to speak of within the rule.

(3) Mr. Biddlecom, the executor, was called in behalf of the proponents and stated that he drew the will and that he had resided in Lafargeville fifty years, with the exceptions of three years when he was county clerk, and then he was asked to state generally the business transactions he had had with the deceased and his relations with him. This question was objected to by the contestants on several grounds, and among them "that being the sole executor and interested in the estate to the extent of his fees, he is incompetent under the section of the Code." The objection was overruled and an exception was taken.

When *Rugg* v. *Rugg* (21 Hun, 383), was before this court, in the course of the opinion prepared by me, I said: "Jenks, who was named as one of the executors, was also called as a witness in behalf of the proponents, and gave evidence of the facts and circumstances attending the execution of the will. His testimony was objected to by the contestants. But the authorities require us to

hold that he was a competent witness, and that his testimony was properly received by the surrogate. (*McDonough* v. *Loughlin*, 20 Barb. 238; *Children's Aid Society* v. *Loveridge*, 70 N. Y. 387; *Pruyn* v. *Brinkerhoff*, 7 Abb. Pr. [N. S.] 401.) We must, in considering the question raised in respect to the due execution of the will, give effect and force to the evidence given by Jenks. He was a man about sixty years of age (Biddlecom was about sixty-eight), had been accustomed to draw wills and supervise their execution, and the evidence given by him is to the effect that the essentials to a due execution were all observed, and he is emphatic in his statements that the testator subscribed his name before the subscribing witnesses. It is settled beyond doubt or discussion that the due execution of a will may be established by other evidence than such as may be derived from the subscribing witnesses." That case was affirmed by the Court of Appeals. (See 83 N. Y. 592.)

In *Matter of Will of Smith* (95 N. Y. 516), the executor who presented the will for probate was "the principal legatee," and, therefore, the case is distinguishable from the one before us. That case is explained by RUGER, Ch. J., in *Matter of Will of Wilson* (34 Alb. L. J. 476; S. C., 103 N. Y. 374). In *Lane* v. *Lane* (95 id. 494), the witness was not only executrix, but a legatee, and the case, therefore, differs from the one before us.

Our attention has been called to numerous other exceptions taken during the trial; we have examined them, and are of the opinion that they do not require us to order a new trial.

In *Clapp* v. *Fullerton* (34 N. Y. 190), it was said, in respect to appeals from surrogates, that "The review is in the nature of a rehearing in equity, and the admission of improper evidence on the original hearing furnishes no ground for reversing the final decision, if the facts established by legal and competent testimony are plainly sufficient to uphold it." The substance of the rule has been put into section 2545 of the Code of Civil Procedure, in the following language: "But such a decree or order shall not be reversed for an error in admitting or rejecting evidence, unless it appears to the appellate court that the exceptant was necessarily prejudiced thereby." (*Matter of Will of Smith*, 95 N. Y. 527; *Horn* v. *Pullman*, 10 Hun, 471; S. C. affd., 72 N. Y. 269; *Brick* v. *Brick*, *supra*; *Matter of Will of White*, 121 N. Y. 406.) That part of

the surrogate's decree awarding costs to the proponents was not appealed from, and is not here for consideration. That part of the surrogate's decree awarding costs was within his discretion. So much of the decree as is appealed from should be affirmed, with costs, payable out of the estate. (Code Civ. Proc. § 2589; *Matter of Will of Wilson*, 103 N. Y. 374; *Matter of Budlong*, 33 Hun, 236; S. C. affd., 100 N. Y. 206.)

MERWIN and PARKER, JJ., concurred.

Decree of the Surrogate's Court of Jefferson county, so far as the same is appealed from, affirmed, with costs to the respondents, payable out of the estate.